STATE OF NORTH CAROLINA v. BENNY WAYNE MILLS

No. 8617SC590

(Filed 30 December 1986)

1. Criminal Law § 98.2— homicide — sequestration of witnesses denied — no abuse of discretion

The court did not abuse its discretion in a murder prosecution by denying defendant's motion to sequester the State's witnesses where each witness testified to largely different events.

2. Homicide § 18; Criminal Law § 34.7— homicide — prior bad acts — inadmissible to show premeditation and deliberation

Evidence of prior misconduct was not admissible in a homicide prosecution to show premeditation and deliberation where defendant, in 1982, told his eventual victim to hush, pointed his gun at him, fired into the ceiling, and shot his victim in a altercation in 1985. There were no verbal threats to kill the victim in 1982, both men laughed afterwards, there was no indication of ongoing ill will from the incident, and the evidence did not show that defendant formed the intent to kill the victim in 1982. N.C.G.S. § 8C-1, Rule 404(b).

3. Homicide § 19.1; Criminal Law § 85.2— homicide — prior act of misconduct — not admissible to show character for violence

The trial court erred in a homicide prosecution by allowing testimony of a prior act of misconduct by defendant to show defendant's character for violence and that he had acted in conformity with that character and not in self-defense. N.C.G.S. § 8C-1, Rule 404(b).

4. Criminal Law § 162.1— homicide — inadmissible prior bad acts — continuing objection

Defendant's pattern of objections to testimony of prior bad acts in a homicide prosecution constituted a continuing objection to the line of questioning and all of the acts were considered on appeal even though only a part of them were objected to at trial and brought forward as exceptions where defense counsel had ceased to object because of the apparent futility of it.

**5. Homicide § 19.1— defendant's prior violent acts—inadmissible**

The trial court erred in a homicide prosecution by allowing evidence of prior acts involving defendant's ownership of guns and the various items he had shot at, and concerning an incident in which he had thrown the two men responsible for the car wreck in which his fiancee had died into a pond. Each of the acts was clearly relevant to no other issue than to show that defendant was a violent man and therefore must have been the aggressor when he shot and killed the victim, and there was prejudice because of the sheer number of extrinsic acts of violence allowed into evidence, the evidence was not quickly brought up and dropped but was drawn out and emphasized, the State's primary evidence was the testimony of the victim's mother, and it is reasonable to infer that the jury could have chosen to believe defendant's version of events without the inadmissible evidence and the resulting prejudice.

**6. Criminal Law § 102.9— homicide—State's argument on defendant's character —prejudicial**

The trial court in a homicide prosecution should not have allowed the State in its argument to the jury to repeatedly refer to defendant as an educated man who came from another city to live with ordinary people to whom he felt superior.

APPEAL by defendant from *Rousseau, Judge.* Judgment entered 15 February 1986 in SURRY County Superior Court. Heard in the Court of Appeals 11 November 1986.

Defendant was charged with murder in the first degree of Danny Lee Smith in violation of N. C. Gen. Stat. § 14-17. The evidence at trial tended to show the following events and circumstances:

Defendant Ben Mills, age 50, had lived with Hazel Moser in her mobile home for about five years prior to the incident on 14 August 1985. Hazel's son, Danny Lee Smith, age 32, had lived with them for approximately six weeks before his death; he and his wife Linda had separated. Hazel's 88-year-old mother also lived with them. Danny and Ben had been friends for several years, and it was through Danny that Ben met Hazel.

Danny and Ben spent much of 14 August together. Both men had been drinking. An autopsy showed that at the time of his death Danny's blood alcohol content was .26%. Shortly after 7:00 p.m., Hazel called Ben in for supper. Danny was already in the living room of the trailer talking on the telephone. After a few minutes, he started talking in a loud and angry manner. Hazel asked him to be quieter since her elderly mother was getting upset. Danny turned to Hazel and said, "Shut up, you lying bitch."

Ben got up from the table and knocked the telephone out of Danny's hand. Ben picked it up, gave it back to Danny and asked him to continue his conversation in the back of the trailer; Danny did so. Ben returned to the table. In a few minutes, Danny came into the living/dining area where his mother was sitting and told her, "I ought to kill you now, you lying, whoring son of a bitch." He then hit her on the back of the head with such force that it threw her whole upper body forward. Hazel, crying, asked Danny to leave. Ben asked him to come outside with him; they left the trailer.

Here the testimony of the two witnesses, Hazel and Ben, diverges. Defendant testified as follows: As they stood outside, Danny was extremely aggravated. He said his mother was the reason his father was dead. At one point, he grabbed Ben and threw him up against the car, saying, "I'm going to kill her tonight, you son of a bitch. And if you try to stop me, I'll kill you too." Hazel came outside perhaps fifteen minutes after they left the trailer. Danny accused her of having caused his father's death. While running toward the truck where she was standing, he was shouting, "I'm going to kill her now." He reached the passenger's side of the truck and grabbed some sort of stick or pipe that was four or five feet long, black in color, and probably an inch and a half in diameter. Hazel was on the driver's side of the truck. Ben ran toward the passenger's side where Danny was and stopped near the back of the truck. Danny again said to Hazel, "I'm going to kill you now." As Danny made a motion toward Hazel, Ben shouted, "Danny, don't." Danny told Ben, "I told you what I was going to do, you son of a bitch." Danny started around the truck toward Ben, raising his right hand. Ben backed away. Danny leaned forward with his arm raised as if getting ready to strike Ben. Ben shouted, "Danny, don't do it," and fired his pistol as he turned his head to avoid the blow.

Hazel Moser testified that fifteen minutes after the men went outside, she became worried and went to check on them. Danny and Ben were standing next to the car talking, and Danny yelled "Mama." Hazel replied, "I'm not your mama the way you treated me." She walked toward the truck and proceeded to roll up its windows. Danny and Ben came toward her, and Danny was "quarrelling" loudly; the witness could not remember the words he was using. Danny leaned against the truck. Ben said some-

thing, and Danny turned to face Ben. Danny had nothing in his hand. She saw Ben fire the gun.

The two witnesses were in agreement on the pertinent facts which followed: Danny had fallen, but then got partway back up. Ben and Hazel each took an arm to help in moving Danny toward the car to take him to the hospital, but Danny collapsed. Ben began administering CPR and Hazel called the rescue squad. Ben was still administering CPR when the rescue squad arrived. Danny died that night.

The jury returned a verdict of guilty of second degree murder. Defendant appealed from a judgment of forty years' imprisonment.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Wilson Hayman, for the State.*

*Hugh H. Peoples for defendant-appellant.*

WELLS, Judge.

[1]  In his first assignment of error, defendant contends that the court erred in denying his motion to sequester the State's witnesses. We disagree. The rule in this State is that a motion to sequester witnesses is addressed to the discretion of the trial court, and the court's denial of the motion will not be disturbed absent a showing of abuse. *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574 (1982). The defendant here argues that the State's primary witnesses were related and that there was a greater risk that they would conform their testimony. However, since each witness testified to largely different events, that risk was diminished, and it was well within the discretion of the trial court to deny defendant's motion. This assignment is overruled.

[2]  Defendant contends in his second assignment of error that the court erred in permitting the State to present testimony and cross-examine defendant concerning his prior bad acts. His first exception is to the introduction of testimony by Hazel Moser, which tended to show the following. Approximately three years before the shooting, Danny Lee Smith, his wife Linda, Ben Mills, and Ms. Moser were in the living room of the trailer. Defendant and Mr. Smith had both been drinking, and Danny was "fussing." Ben told him to hush and pointed his .22 Magnum at Danny's

stomach. He then fired the gun at the ceiling, after which both the defendant and Danny laughed. Defendant contends that this evidence was inadmissible under N. C. Gen. Stat. § 8C-1, Rule 404(b) of the N. C. Rules of Evidence.

Rule 404(b) provides as follows:

> (b) *Other crimes, wrongs or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

Not only must evidence be offered pursuant to a controverted fact at trial—it must be *logically relevant* to that fact:

> 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

G.S. § 8C-1, Rule 401. This requirement is particularly important when considering admission of prior wrongs. As our Supreme Court held in *State v. McLain*:

> . . . the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny. Whether the requisite degree of relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors. Hence, if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected. (Citations omitted.)

240 N.C. 171, 81 S.E. 2d 364 (1954). In the case at bar, the State contends that Ms. Moser's testimony was admissible under 404(b) to show that the defendant's act was premeditated and deliberate. We disagree.

Evidence of other crimes, wrongs or acts is admissible to show that a defendant had the requisite mental intent or state, *State v. King*, 301 N.C. 186, 270 S.E. 2d 98 (1980), *McLain, supra*; in this case, premeditation and deliberation. Premeditation has been defined by our Supreme Court as thought beforehand, however short. *State v. Corn*, 303 N.C. 293, 278 S.E. 2d 221 (1981). A killing is deliberate if it is done in a "cool state of blood," without legal provocation, and in furtherance of a "fixed design to gratify a feeling of revenge, or some unlawful purpose." *Id.* The question, then, is whether the evidence was relevant to these issues. Ms. Moser testified that the defendant told Danny to hush, pointed his gun at him and then fired up into the ceiling. No verbal threats to kill him were communicated, and both men laughed afterward; there is no indication that any ill will might be ongoing from the incident. Nor does the evidence tend to show that, when he pointed the gun at Danny in 1982, the defendant formed the intent to kill which was only realized three years later. Due to the circumstances of the incident and its extreme remoteness, the evidence has no tendency to make the existence of premeditation or deliberation "more or less probable than it would be without the evidence." Rule 401.

[3] It is apparent from the record that the prosecution introduced the evidence at trial in order to show that the defendant was the aggressor and did not act in self-defense. In *State v. Morgan*, 315 N.C. 626, 340 S.E. 2d 84 (1986), our Supreme Court addressed the admissibility of prior wrongs for such a purpose. The defendant in that case had pointed a gun three months earlier at someone other than the man for whose murder he was being tried. The court found that the question of aggression was a contested element of defendant's self-defense claim, but held that the State's assertion that pointing a gun at another man was relevant to that claim "is precisely what is prohibited by Rule 404(b)":

> In order to reach its conclusion, the State is arguing that, because defendant pointed a shotgun at Mr. Hill [sic] three months earlier, he has a propensity for violence and therefore must have been the aggressor in the alleged altercation with Mr. Harrell and, thus, could have been acting in self defense.

*Id.* However, the court recognized that a different result might have been reached under other circumstances:

> Had the State's evidence been to the effect that defendant pointed a gun at or threatened Mr. Harrell three months earlier, such evidence would more likely be relevant as tending to show a plan or design, or as negating the defendant's claim that Mr. Harrell's attack on him was unprovoked.

*Id.* While situations such as the one before us are specifically excepted from the holding, the question of relevancy still remains to be determined. Self-defense raises the issue of the reasonableness of defendant's belief as to the necessity for, and reasonableness of, the force used to repel an attack upon his person. *Id. See also State v. Gladden,* 279 N.C. 566, 184 S.E. 2d 249 (1971). Here, the fact that defendant pointed his gun at Danny does not indicate that three years later he did not fear Danny or "make the apparent necessity to defend himself more or less probable than it would be without the evidence." *State v. Morgan, supra.* Thus, it was error to allow testimony of this extrinsic act of misconduct in order to show defendant's character for violence and that therefore he must have acted in conformity with that character, and not in self-defense, when he shot Danny Lee Smith.

[4] Defendant also takes exception to a number of other instances in which the trial court allowed testimony of prior bad acts. Although only part of these were objected to at trial and brought forward as exceptions to support the assignment of error, it would seem that counsel had ceased to object because of the apparent futility of it. We find that the pattern of objections constitutes a continuing objection to the line of questioning with respect to bad acts. Therefore, we will consider all of these acts, some brought out on cross-examination of defendant and some testified to by the State's witnesses.

[5] First, evidence indicating that at one time or another defendant shot the following items: an alarm clock; his motorcycle; a windowpane, wall, floor, bathroom mirror, antenna and meterbox of Ms. Moser's trailer. In addition, when he shot into her garden to scare some chickens away, he shot through the trees in the direction of a neighbor's house. The second type of evidence of bad acts concerns defendant's guns. The prosecutor asked defendant if he had told someone that he could take one of his own ordinary guns "and put a crank on it so you could fire it like a Gatling gun and fire it with a crank?" Over objection, defendant

was required to answer that he had purchased a crank at Pop's Gun Shop in Mount Airy. The prosecution also inquired in great detail into the number and types of guns defendant owned. Another incident concerned defendant's reaction to his fiancee's death in a car wreck years before. The prosecution asked if he had found the two men who had caused the accident and thrown them into a pond. This line of questioning was pursued for some time although defendant denied any knowledge that the wreck was anything other than a single-car accident.

As discussed *supra*, evidence of prior wrongs cannot come in to show the character of a person and that he acted in conformity with that character. Rule 404(b). Here, each of these incidents was clearly relevant to no other issue than to show that the defendant was a violent man and therefore must have been the aggressor on 14 August when he shot and killed Danny Smith. All of this evidence was in direct contravention of Rule 404(b) and the trial court erred in allowing it.

We now consider whether admission of these extrinsic acts was prejudicial: whether there is "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." N.C. Gen. Stat. § 15A-1443(a) (1983). First, we note the sheer numbers of extrinsic acts of violence which were allowed into evidence: there were at least fourteen separate acts just involving shots fired by the defendant. Nor were the acts quickly brought up and then passed over. Testimony concerning several of the incidents was considerably drawn out; for example, the prosecution questioned two of its own witnesses as well as cross-examined the defendant concerning the incident when Ben pointed the gun at Danny and then fired into the air. Moreover, the State introduced pictures of several items which had been shot and even introduced the motorcycle itself. Nor can we say that the error was harmless in light of other evidence properly admitted at trial. The State's primary evidence is the testimony of Hazel Moser regarding the events of 14 August. Although an eyewitness to the incident, she is the victim's mother; without inadmissible evidence of defendant's prior acts and the prejudice resulting therefrom, it is reasonable to infer that the jury could have chosen to believe defendant's version of the events. Due to the incendiary nature of the evidence improperly admitted, and the emphasis placed on that evidence at

trial, we find that its admission was prejudicial error requiring a new trial.

[6] Of defendant's remaining assignments of error, we need address only one: his contention that the trial court erred in failing to order *ex mero motu* a new trial based on improper portions of the State's argument to the jury. Defendant excepts primarily to the prosecutor's repeated referral to defendant as an educated man who comes in from another city to live with ordinary people to whom he considers himself superior. We quote from some of the exceptions set forth:

(1) Did he have respect for him? Now, I don't know how to put this, ladies and gentlemen of the jury, other than — and I don't mean to offend the family of the victim. But there is something here, ladies and gentlemen of the jury. There's a difference here, isn't there? And I think it makes the difference in this case. On the one hand you've got this fellow here that came to them from somewhere else, Hendersonville or wherever . . . . And I don't know how to say it but other than I've got a feeling that he would love for you to feel just like he did, that life of Danny Smith wasn't worth that much. . . . He probably never did consider Danny Smith himself worth a whole lot.

(2) If you're going to find the truth about it, you don't have to ride along on your white horse and be a planter and a genteel pilot and anything else.

(3) But somehow I get the feeling that Mr. Mills is put out by the fact that we're trying so hard in this case. 'Well, they're trying to convict me, I believe. They're serious. Well, I'm an educated man. I'm a college man. Was Danny Smith's life worth all of that? Should he have got on me so hard over Danny Smith?' Don't you all get that feeling? That's his attitude about this case.

(4) I'm Ben Mills. I can shoot him down. I'm above these people over there. . . .

(5) But nobody is in favor of first degree murder. I don't care if it's a Southern Planter that's done it and he done plum shot him down, Mr. Mills, or the sorriest, low-down dog that ever came into the county that done it.

(6) Maybe Mr. Genteel Planter over here didn't want to get his little pinky finger dirty pulling the trigger.

(7) Put yourself in his shoes. That's what his lawyers want you to do. Put yourself in there. Crawl right on in there and you'd be hot stuff. Imagine yourself.

(8) Why didn't they put up somebody besides Mr. Genteel over here to tell you about that?

In addition, the prosecutor stated several times that defendant lied or would lie.

The general rule in this State is that counsel must be allowed wide latitude in his argument to the jury, *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975), and counsel may "argue all the law and facts that are in evidence and all reasonable inferences to be drawn therefrom." *Id.* In the case at bar, counsel's argument was clearly improper. First, its factual basis is faulty. Second, even if such statements were factually accurate, there is nothing to support the inference that defendant's rationale for killing Danny was—as the prosecutor put it—" 'I'm Ben Mills. I can shoot him down. I'm above these people over there. . . .' " Clearly, the purpose of this line of argument was to incite the prejudices of the jurors against the defendant and was therefore improper, and should not have been allowed.

For the reasons stated above, we find that defendant is entitled to a

New trial.

Judges BECTON and ORR concur.