STATE OF NORTH CAROLINA v. PETE DRAKE IRBY

No. 9217SC696

(Filed 1 February 1994)

1. **Homicide § 287 (NCI4th)— second-degree murder—self-defense—sufficiency of evidence**

   The State presented substantial evidence of each element of second-degree murder and substantial evidence from which the jury could infer that defendant did not act in self-defense or in defense of his family where the evidence tended to show that there was a forty-five minute delay between the firing of shots and a telephone call for emergency help; it could be inferred from this delay that defendant intended to assure the deaths of the victims rather than merely to stop any aggression by the victims toward defendant's father; evidence of the physical conditions of defendant's father and the victims after the shootings was inconsistent with defendant's contention that the victims had pulled his father from his car and beaten him while defendant's mother went for help; and defendant's self-defense statement was contradicted by evidence of the location of the gunshot wounds on one victim, the location of one victim's shotgun seventeen feet from his body, and the simultaneous blasts of a rifle and a shotgun.

   **Am Jur 2d, Homicide §§ 425 et seq.**

2. **Evidence and Witnesses § 367 (NCI4th)— second-degree murder—self-defense—evidence of prior shootings—erroneous admission**

   The trial court in a second-degree murder case erred in admitting evidence of two prior shooting incidents by defendant and his father, though the State ostensibly offered evidence of the prior shooting incidents to show defendant's intent, since there was no connection between those shootings and the crimes charged other than to show defendant's character and propensity for violence and that he must have acted in conformity with that character and not in self-defense. N.C.G.S. § 8C-1, Rule 404(b).

   **Am Jur 2d, Homicide § 310.**

3. **Criminal Law §§ 1122, 1126 (NCI4th) — second-degree murders — sentencing — finding of two aggravating factors error**

The trial court erred as a matter of law in making two findings in aggravation for each of two second-degree murders: (1) that there was a pattern or course of violent conduct in shooting at people with a rifle on one or more occasions making defendant a danger to the community and other people, and (2) that defendant failed to render aid to the victim.

**Am Jur 2d, Criminal Law §§ 598, 599.**

Appeal by defendant from judgments entered 30 September 1991 by Judge William Z. Wood, Jr., in Caswell County Superior Court. Heard in the Court of Appeals 25 May 1993.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Mary Jill Ledford, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Constance H. Everhart, for defendant appellant.*

COZORT, Judge.

Defendant was convicted of two counts of second degree murder and sentenced to life in prison. We find the trial court committed prejudicial error in admitting evidence that the defendant had been involved in a shooting incident three years earlier, and we remand for a new trial.

The State presented the following evidence. On 1 December 1990, Keith Dunevant, aged 33, Kim Dunevant, aged 30, and Coy Dunevant were on a farm owned by Coy Dunevant's mother and located in southern Caswell County. Keith and Kim had gone to the farm to hunt. Keith had a pump shotgun and a fixed blade knife. Kim was armed with a 30-06 rifle. Defendant and his family lived near the farm. At approximately 5:45 p.m., two neighbors, Virginia and Marvin Jones, heard a total of six gunshots coming from the direction of the Irby property. Virginia Jones testified that she first heard three rifle shots, then, three seconds later, a shotgun blast and an almost simultaneous rifle shot, and then three or four seconds later, another rifle shot. Craig Cox testified that sometime after 5:00 p.m., on 1 December 1990, he heard three

shotgun blasts and two rifle shots coming from the direction of the Irby property. At 6:15 p.m., Laura Wilson, the daughter of an Emergency Medical Technician, received a telephone call from a woman seeking assistance for her husband who had been shot on Smith Loop Road. Wilson gave the caller the number for emergency assistance. At 6:28 p.m., a caller identifying herself as Vicky Irby called the Sheriff's Department and reported a shooting on Smith Loop Road. The woman stated that her father had been shot and needed an ambulance.

Emergency Medical Technician David R. Smith, and Deputy Sheriff Gywnn Brandon arrived at the scene and found Kim's truck sitting sideways off the right-hand side of the road with the headlights on, the driver's door open, and the passenger window down. The truck was running, in neutral, and the hand brake was set. Kim's rifle was unloaded in the gun rack. Smith observed an orange hunting cap lying left of center in the road and a pump shotgun lying sideways in the road approximately 30 to 50 feet from the hat. Deputy Sheriff Brandon ran over the shotgun when approaching the house. When Smith and Brandon arrived at the Irby house, they saw defendant, his father Acie Irby, Acie's wife Brenda, Acie's daughter Vicky, and another woman. Defendant immediately stated that two men had attacked his father and that he had shot them down at the creek with a 30.30 lever-action rifle, which now was propped against the porch. Deputy Sheriff Brandon secured the rifle, which contained five rounds of ammunition. Smith examined Acie and determined that he had no life threatening injuries.

Deputy Sheriff Brandon examined Keith's .12 gauge shotgun. The breach was closed and ready to fire, but there was no ammunition. Kim's body was discovered approximately 5 to 10 yards off the south side of the road according to Smith, 5 to 50 feet according to Brandon. Kim was lying on his back with a gunshot wound to the face and no vital signs. Keith's body was discovered in a ditch on the north side of the road, approximately 20 to 40 yards from Kim. Keith had a gunshot wound to his chest and had been dead no more than three minutes when his body was discovered. His hunting knife was above his head. His shotgun was approximately 17 feet away. The medical evidence showed that at the time of death, Keith had a blood alcohol level of .24 percent and Kim had a blood alcohol level of .17 percent.

Defendant was taken into custody and advised of his *Miranda* rights. He gave the following statement while seated in a deputy's car. He stated that the Dunevant's truck came down the road when his parents left in the car to go to the store. His mother returned to the house and told him that two hunters stopped in the road, approached the car, pointed a gun in Acie's face, pulled him out of the car, and started to beat him. His mother pushed the truck out of the road with her car and returned to the house. She told defendant to bring his gun because the men were going to kill his father. When defendant arrived, the two men were still beating his father. One of the men, Keith, started walking towards him with a switchblade knife. Keith shoved the defendant into the ditch, and as defendant tried to get out of the ditch, Keith reached for his shotgun. Defendant thought he heard Keith say that he was going to kill him, but Keith was drunk and difficult to understand. Defendant shot Keith. Keith spun around and fell into the ditch. Defendant heard his father yell for help. Defendant heard Kim say he was going to kill Acie and saw Kim with something in his hand continuously beating Acie. Although Kim's back was to defendant, Kim had turned his face towards him. Defendant was 50 to 60 feet away when he shot Kim in the head. Defendant and his father walked back to the house.

At the police station, defendant signed a waiver of his *Miranda* rights. He stated that he wanted to correct part of his earlier statement. He had not given the information earlier because he did not want to get his mother in trouble. In his revised statement, defendant stated that he heard five or six gunshots as his parents were going down the road. When defendant's mother came back to get him, she grabbed a .12 gauge shotgun and some birdshot shells. When they arrived at the scene, defendant saw Keith and Kim beating Acie. Keith approached defendant and shoved him into a gully. Defendant's mother told him that Keith had a shotgun and was going to shoot defendant who was face down in the ditch. Defendant's mother grabbed the .12 gauge shotgun and shot Keith in the legs to stop him. When defendant got up, Keith was sitting in the gully with the shotgun and was getting ready to turn around and shoot defendant when defendant shot Keith. When Keith fell back, the shotgun went to his side. The remainder of defendant's statement did not change.

Dr. John D. Butts, the chief medical examiner for the State of North Carolina, testified that Keith Dunevant was fatally wound-

ed by a bullet shot once in the upper right back, just right of the base of the neck and shoulder. The bullet exited in the midline center of the chest. Keith also suffered a shotgun wound to the lower back of his legs. The shotgun pellets came from behind Keith and traveled downwards. From the pattern of the buckshot on the legs, Dr. Butts testified that it was possible that the wounds were inflicted while Keith was running. The wounds to the legs were inflicted by a gun approximately 30 feet away. Keith had bruises on his right knuckles and a fresh cut on one of his knuckles. There were no injuries to his left hand.

Dr. Butts further testified that Kim Dunevant died as a result of a bullet entering the left side of the neck and exiting at the edge of his jaw on the right. Kim's hands were free of bruising, with no scrapes or cuts. On the back of his left hand, Kim had a small discoloration.

Dr. David Dubois, the emergency room physician who examined Acie on 1 December 1990, testified that Acie was unable to recall his birthday or state why he was at the hospital. A physical examination showed that Acie had a bruise to the right eyebrow and some blood in the right nasal passage. There was no evidence that Acie had been hit in the abdomen or any other area of the face. There were no broken bones or deep lacerations.

The State also presented evidence that on 23 December 1988, Sam Butler and some friends were driving on the road and threw some firecrackers in the road. Butler accelerated down the road and heard two gunshots from two guns. He lost control and had a flat tire. As he tried to get the truck out of the ditch, he heard bullets whizzing over his head. Later that day, defendant told a neighbor that he had shot at someone who had thrown firecrackers in his yard.

Defendant presented no evidence. On appeal, defendant argues that the trial court erred in (1) denying defendant's motion to dismiss the charges; (2) permitting evidence about a prior incident in which defendant fired shots at a truck on the road; (3) relying upon aggravating factors which were not supported by the evidence or were improper as a matter of law; and (4) failing to find as a mitigating factor that defendant acted under strong provocation.

[1] In his first assignment of error, defendant argues that the trial court erred in denying defendant's motion to dismiss because

the State failed to present substantial evidence that defendant acted with malice. The trial court must grant defendant's motion to dismiss if, viewing the evidence in the light most favorable to the State, the State fails to present substantial evidence of each element of the crime charged. *State v. Herring*, 322 N.C. 733, 738, 370 S.E.2d 363, 367 (1988). "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The test of sufficiency of the evidence is the same whether the evidence is direct, circumstantial, or a combination of the two. *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978). Where evidence is circumstantial, " 'the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy them beyond a reasonable doubt that the defendant is actually guilty.' " *Id.* at 244-45, 250 S.E.2d at 209 (quoting *State v. Rowland*, 263 N.C. 353, 139 S.E.2d 661 (1965) ).

First degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Norris*, 303 N.C. 526, 529, 279 S.E.2d 570, 572 (1981). Second degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation. *Id.* "As a general rule, malice exists as a matter of law whenever there has been an unlawful and intentional homicide without an excuse or mitigating factors." *State v. Torres*, 99 N.C. App. 364, 370, 393 S.E.2d 535, 539-40 (1990), *rev'd on other grounds*, 330 N.C. 517, 412 S.E.2d 20 (1992). "Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation." *Norris*, 303 N.C. at 529, 279 S.E.2d at 572.

The defendant contends the State failed to present substantial evidence that the defendant acted with malice and not in lawful defense of himself and his father. In *Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73, the North Carolina Supreme Court set forth the following requirements of "perfect self-defense" which negate any criminal responsibility for the killing of another person:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were suffi-

cient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, *i.e.*, he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, *i.e.*, did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

"The reasonableness of [defendant's] belief is to be determined by the jury from the facts and circumstances as they appeared to the defendant at the time of the killing." *State v. Jones*, 299 N.C. 103, 111, 261 S.E.2d 1, 7 (1980).

Imperfect self-defense arises if the first two elements in the above quotation are present and neither of the latter two elements are present. *State v. Maynor*, 331 N.C. 695, 699, 417 S.E.2d 453, 456 (1992). If defendant acted in imperfect self-defense, the charge of murder is reduced to manslaughter. *State v. McAvoy*, 331 N.C. 583, 596, 417 S.E.2d 489, 497 (1992). The above principles are equally applicable when a person acts in defense of a family member. *Jones*, 299 N.C. at 111, 261 S.E.2d at 7.

The State has the burden of proving by substantial evidence that defendant did not act in perfect or imperfect self-defense. *State v. Hamilton*, 77 N.C. App. 506, 513, 335 S.E.2d 506, 511, *cert. denied*, 315 N.C. 593, 341 S.E.2d 34 (1985). "When evidence introduced by the State consists of exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by those statements." *State v. Meadlock*, 95 N.C. App. 146, 149, 381 S.E.2d 805, 806, *disc. review denied*, 325 N.C. 434, 384 S.E.2d 544 (1989).

Defendant argues that the State is bound by his exculpatory statements which show that he was acting in self-defense when he shot Keith Dunevant and acting in defense of his father when he shot Kim Dunevant. The State argues that physical and other evidence contradicts defendant's version of the encounter and that the State carried its burden of proving that defendant did not act in self-defense. Specifically, the State first argues that the forty-five minute delay between the firing of the shots and the

telephone call for emergency help showed that defendant intended to assure the deaths of the victims rather than merely to stop any aggression. Witnesses heard a shotgun blast and several rifle shots near the Irby property at approximately 5:45 p.m. Vicky Irby did not call emergency personnel until 6:15 p.m. After Laura Wilson instructed Vicky to call 911, Vicky did not make that call until 6:28 p.m., nearly forty-five minutes after the shots were heard. At that time, she stated that her father had been shot and needed help.

Second, the State argues that the evidence of the physical conditions of Acie Irby, Keith Dunevant and Kim Dunevant, after the shootings is inconsistent with defendant's statement that Keith and Kim had pulled Acie from his car and beat him while defendant's mother went for help. The State argued at trial that Acie's injuries were not severe enough to support defendant's statement that Keith and Kim, two large men, had beaten Acie for several minutes while defendant's mother went for help. The State contended that the minor injuries to Acie could have been inflicted by a family member as part of a cover-up story. The medical evidence showed that Acie had a bruise to the right eyebrow, an abrasion on his face, and some blood in his right nasal cavity. Acie's dentures were not dislodged and he had no broken bones. Keith had bruises on his right knuckles which could have been caused by striking a hard object or having his hand struck by a hard object. Kim had only a small discoloration on the back of his left hand; there were no scrapes or significant bruising on either hand.

Finally, the State argues that defendant's statement was contradicted by evidence of the location of the gunshot wounds on Keith's body, the location of Keith's shotgun seventeen feet from Keith's body, and the simultaneous blasts of a rifle and shotgun. Defendant stated that Keith had pushed him in a gully. While he was in the gully, defendant's mother shot Keith in the back of the legs because Keith was attempting to shoot defendant. Defendant shot Keith as Keith attempted to turn around and shoot defendant. Keith's shotgun flew to his side after he was hit by the bullets. The State contended at trial that the medical evidence permitted an inference that Keith was shot from behind as he was running away. The medical evidence showed that Keith was shot in the back of the legs with birdshot. The pattern of the birdshot on the legs supported an inference that defendant was running when he was shot. In addition, the bullet entered Keith's

body in the upper back. The State further contended that the physical evidence contradicted defendant's statement. Keith's shotgun was found seventeen feet from his body, permitting an inference that he was not armed when defendant shot him. Finally, witnesses testified that they heard a shotgun blast simultaneously with a rifle shot, permitting a reasonable inference that defendant and his mother shot Keith as he was running away.

Reviewing the evidence, we find that the State presented substantial evidence of each element of the crime charged. We further find that the State presented substantial evidence from which the jury could infer that defendant did not act in self-defense or in defense of his family. Accordingly, we find that the trial court did not err in denying defendant's motion to dismiss.

[2] In his second assignment of error, defendant argues that the trial court erred in permitting into evidence defendant's following statements:

A. Okay, the question was, "Has your daddy ever had any problems with these boys themselves?"

Answer, "No, the only person Daddy had problems with hunting was Fred Cox, but he hasn't ever had fighting problems, just words."

Question, "You're being pretty truthful right now, I think, I don't want you to stop, but it's a fact your daddy has shot over somebody's truck in the past."

"He shot up in the air, not over the truck," that was his answer.

Defendant further argues that the trial court erred in allowing two witnesses to testify that in December 1988, defendant and his father fired shots over a truck driving on the road near defendant's house. The State argues that the evidence was admissible to show defendant's intent. We disagree.

N.C. Gen. Stat. § 8C-1, Rule 404(b) provides:

*Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake, entrapment or accident.

"Rule 404(b) state[s] a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

> Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also "is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried."

*State v. Bagley*, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), *cert. denied*, 485 U.S. 1036, 99 L.Ed.2d 912 (1988) (quoting *State v. Morgan*, 315 N.C. 626, 637, 340 S.E.2d 84, 91 (1986)).

In *Morgan*, the North Carolina Supreme Court found that the trial court erred in permitting testimony that approximately three months before defendant allegedly killed the decedent, defendant had pointed his shotgun at two other men. Rejecting the State's argument that the evidence was admissible to show "that defendant's pointing of the shotgun at the decedent and shooting him was not in self-defense," the Court stated:

> The State's rationale here is precisely what is prohibited by Rule 404(b). In order to reach its conclusion, the State is arguing that, because defendant pointed a shotgun at Mr. Hill three months earlier, he has a propensity for violence and therefore he must have been the aggressor in the alleged altercation with Mr. Harrell and, thus, could not have been acting in self-defense. Indeed, the Commentary to N.C.G.S. § 8C-1, Rule 404(b) infers that "evidence of a violent disposition to prove that the person was the aggressor in an affray" is an impermissible use of "evidence of other crimes, wrongs, or acts."

*Id.* at 638, 340 S.E.2d at 92. In *Morgan*, the Court rejected the State's argument:

> In the instant case, defendant claimed neither that his shooting Mr. Harrell was accidental or inadvertent nor that

he was unable to form the requisite criminal intent to shoot Mr. Harrell. He claimed that he shot Harrell in self-defense. The proper inquiry in a self-defense claim focuses on the reasonableness of defendant's belief as to the apparent necessity for, and reasonableness of, the force used to repel an attack upon his person. The fact that defendant may have pointed a gun at another person sometime in the past, without more, has no tendency to show that the defendant did not fear Mr. Harrell or to make the existence of his belief as to the apparent necessity to defend himself from an attack "more or less probable than it would be without the evidence."

*Id.* at 639, 340 S.E.2d at 92 (citation omitted) (quoting N.C. Gen. Stat. § 8C-1, Rule 401). The Court further reasoned:

Had the State's evidence been to the effect that defendant had pointed a gun at or threatened *Mr. Harrell* three months earlier, such evidence would more likely be relevant as tending to show a plan or design, or as negating defendant's claim that Mr. Harrell's attack on him was unprovoked.

*Id.* at 639, 340 S.E.2d at 92-93.

In *State v. Mills*, 83 N.C. App. 606, 351 S.E.2d 130 (1986), defendant was convicted of second degree murder after a witness testified that three years prior to the shooting death of the victim, defendant had pointed a .22 Magnum at the victim, told him to "hush," and fired the gun into the ceiling. Defendant and victim laughed after the shot. In finding the evidence inadmissible, this Court quoted from *State v. McClain*, 240 N.C. 171, 177, 81 S.E.2d 364, 368 (1954):

"[T]he dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny. Whether the requisite degree of relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors. Hence, if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected."

*Mills*, 83 N.C. App. at 610, 351 S.E.2d at 133 (quoting *McClain*, 240 N.C. at 177, 81 S.E.2d at 368).

Disagreeing with the State's contention that the evidence was admissible to show defendant had the requisite intent for first degree murder, the *Mills* Court reasoned:

> Ms. Moser testified that the defendant told Danny to hush, pointed his gun at him and then fired up into the ceiling. No verbal threats to kill him were communicated, and both men laughed afterward; there is no indication that any ill will might be ongoing from the incident. Nor does the evidence tend to show that, when he pointed the gun at Danny in 1982, the defendant formed the intent to kill which was only realized three years later. Due to the circumstances of the incident and its extreme remoteness, the evidence has no tendency to make the existence of premeditation or deliberation "more or less probable than it would be without the evidence." Rule 401.

*Id.* at 611, 351 S.E.2d at 133. The Court further noted that "[i]t is apparent from the record that the prosecution introduced the evidence at trial in order to show that the defendant was the aggressor and did not act in self-defense." *Id.* Although recognizing that the *Morgan* court had specifically stated that its ruling might have been different if prior to the shooting defendant had pointed a shotgun at the victim rather than two other men, the *Mills* Court concluded that the evidence of prior conduct offered in the *Mills* case was irrelevant and inadmissible. Reasoning that "the fact that defendant pointed his gun at Danny does not indicate that three years later he did not fear Danny or 'make the apparent necessity to defend himself more or less probable than it would be without the evidence,'" the Court concluded that "it was error to allow testimony of this extrinsic act of misconduct in order to show defendant's character for violence and that therefore he must have acted in conformity with that character, and not in self defense, when he shot Danny Lee Smith." *Id.* at 612, 351 S.E.2d at 134. The Court further found inadmissible evidence that defendant had shot an alarm clock, his motorcycle, a windowpane, wall, floor, bathroom mirror, antenna and meter box in a mobile home, into a garden to scare chickens, and through trees in the direction of a neighbor's house.

We find the principles stated in *Morgan* and *Mills* controlling in this case. Although the State ostensibly offered evidence of

STATE v. IRBY

[113 N.C. App. 427 (1994)]

the prior shooting incidents to show defendant's intent, we perceive no connection between those shootings and the crimes charged other than to show defendant's character and propensity for violence and that he must have acted in conformity with that character and not in self-defense. The prosecutor argued to the jury that the shooting incident was "the most direct evidence of Pete Irby's specific intent to kill and the lack of aggression on the part of our victims . . . ." As in *Morgan*, defendant did not claim that the shooting was accidental or inadvertent, nor did he claim that he was unable to form the requisite criminal intent to shoot the victims. Rather, he claimed that he shot in self-defense and defense of his father. The fact that defendant may have fired shots at a third person three years before has no tendency to show that defendant did not fear Keith and Kim or to make the existence of his belief as to the apparent necessity to defend himself from an attack more or less probable than it would be without the evidence. Therefore, we find the evidence that defendant shot over a truck in 1988 irrelevant and inadmissible. We further find defendant's statements that his father had shot in the air and not over a truck irrelevant and inadmissible. The evidence bears no relation to defendant's intent or the apparent necessity to defend himself. Accordingly, we find that the trial court erred in admitting the evidence of both prior shooting incidents by defendant and his father. We also find, given all the evidence in this case, that the admission of the evidence cannot be deemed harmless error. Defendant is entitled to a new trial.

[3] Two of the defendant's arguments regarding sentencing need to be addressed because the issues may arise at retrial. Defendant correctly argues that the trial court erred as a matter of law in making two findings in aggravation: (1) that there was a pattern or course of violent conduct in shooting at people with a rifle on one or more occasions making the defendant a danger to the community and other people, *see State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988); and (2) that the defendant failed to render aid to the victim, *see State v. Bates*, 76 N.C. App. 676, 334 S.E.2d 73 (1985). The other sentencing issues need not be addressed here.

New trial.

Judges WELLS and JOHN concur.