STATE OF NORTH CAROLINA v. ARTHUR EDWARD BALDWIN, JR.

No. COA99-767

(Filed 18 July 2000)

**1. Sentencing— second-degree murder—aggravating factor— creating a great risk of death to more than one person**

The trial court did not err in a second-degree murder case by finding as an aggravating factor that defendant created a great risk of death to more than one person because: (1) defendant used a sawed-off shotgun during this crime, and a shotgun has the destructive capabilities to be a qualifying weapon under this aggravating factor; (2) defendant deliberately pointed the sawed-off shotgun at both the victim and another individual sitting on

the same bed in a small hotel room; and (3) evidence that the shooting was accidental suggests that a discharge could have occurred when the gun was pointed near other persons.

**2. Sentencing— second-degree murder—aggravating factor— murder committed in course of robbery—motivated by pecuniary gain**

The trial court did not err by finding as an aggravating factor that the murder was committed in the course of a robbery and was motivated by pecuniary gain, even though defendant contends that robbery was an essential element of this felony murder case, because defendant pled guilty and was sentenced for second-degree murder, which does not require robbery as an element.

**3. Sentencing— second-degree murder—aggravating factor— failing to render aid to victim—essence of the crime**

The trial court erred in a second-degree murder case by finding as a nonstatutory aggravating factor that defendant failed to render aid to the victim, and the case must be remanded for a new sentencing hearing, because: (1) an aggravating factor cannot be based on circumstances which are part of the very essence of a crime; and (2) not helping to save a victim is withing the essence of malice, and therefore, is inherent in the malice crime of second-degree murder.

Appeal by defendant from judgment entered 10 December 1998 by Judge Thomas W. Ross in Forsyth County Superior Court. Heard in the Court of Appeals 25 April 2000.

*Attorney General Michael F. Easley, by Associate Attorney General Christopher W. Brooks, for the State.*

*J. Clark Fischer for defendant.*

McGEE, Judge.

Arthur Edward Baldwin, Jr. (defendant) was charged with first degree murder of Debbie Dawn Burnette (Burnette) in a juvenile petition filed 11 July 1994 and was indicted for her murder by a grand jury on 30 January 1995. Defendant was tried during the 30 October 1995 session of Forsyth County Superior Court when the jury was unable to agree upon a unanimous verdict, whereupon the trial court granted defendant's motion for mistrial. During defendant's second trial at the

STATE v. BALDWIN

[139 N.C. App. 65 (2000)]

14 December 1995 session, the State presented eyewitness testimony from Craig Woods (Woods) of the 28 June 1994 murder of Burnette. Woods testified that he had been a friend of Burnette's for approximately nine months before Burnette was killed. At around 8:00 p.m. on the evening before the murder, Burnette and a mutual friend, Todd Culler (Culler), stopped at Woods's house in Winston-Salem to pick him up. Culler drove Burnette and Woods to a sports bar and shortly thereafter to a BP station, where Culler purchased a six-pack of beer. They drove to the Knights Inn, arriving shortly after 9:00 p.m., and spent the night in a room on the second floor. Woods testified that he, Culler, and Burnette drank beer and used cocaine. Burnette and Culler left the room at around 2:00 a.m. for approximately ten minutes to purchase cigarettes, and Culler left for home at around 2:30 a.m. Woods and Burnette remained in the room watching television with the lights off and the front door ajar. Woods sat in a chair in the far right corner of the room and Burnette sat on the bed with her back against the headboard. They heard voices outside at around 3:30 a.m., and Woods went to the door. He saw two black men in the parking lot, one of whom asked Woods "for a light." Woods tossed his lighter to the person, who lit his cigarette and tossed the lighter back up to Woods. Woods then returned to his chair, and the door to the room was "all the way open."

Again Woods and Burnette heard voices, and Woods again went to the door. He saw one of the same men from the parking lot on the breezeway which connected the two buildings of the Knights Inn at the top of the steps. After Woods returned to his chair in the room, the person he had seen on the breezeway tapped on the door and asked to use the phone. Woods testified that "it was [Burnette's] room," so he asked her if this person could use the telephone, and she gave permission. Woods said this person, who was wearing a ball cap, dialed some numbers and then said, "Give me the police."

Woods then saw the other man from the parking lot walking up the steps arguing with the person wearing the ball cap inside the room. This second man also entered the room, told the person on the telephone to hang it up and hand over his valuables, and revealed "a sawed-off shotgun with a pistol grip" that was "[a]round two and a half feet" in length. The person wearing the ball cap "reache[d] from in his pocket and hand[ed] him something" that Woods could not identify, and told the gunman, "Man, somebody is going to see you[.]" The gunman went to the door, pushed it shut, and pointed the gun at Woods and demanded his valuables. Woods was sitting in

a chair with his hands up and replied that he had nothing. The person wearing the ball cap at first had his hands up but at this time was sitting on the edge of the bed closest to Woods. Burnette, who was still sitting with her back against the headboard of the bed, now had her hands up.

The gunman told Woods he was lying about not having anything to give, and then pointed the shotgun at Burnette, repeating his demands and adding, "[g]ive me anything you got." When Burnette was silent, the gunman pointed the shotgun back at Woods, and Burnette "got up and started down the side of the bed [to about the end of the wall]." Using profanity, the gunman forcefully told her to sit back down. Burnette returned to her previous position on the bed when the gunman pointed the shotgun at her, and the weapon discharged.

Woods testified that when the shotgun fired, the gunman was approximately four feet away from Burnette. The gunman then "went to the door, looked out, walked back over toward the bed and then took off out the door." The person wearing the ball cap exclaimed a profanity, went to the door and shouted to the gunman that he knew who he was, and then "took off" while Woods dialed 911.

Defendant was convicted of first degree felony murder on 19 December 1995 and was sentenced to a mandatory sentence of life imprisonment. On appeal to our Court in 1996, defendant argued the trial court erred in not allowing him to cross-examine a police detective and in excluding certain expert psychiatric testimony. We agreed with defendant as to his first argument, and thus reversed and remanded for a new trial in *State v. Baldwin*, 125 N.C. App. 530, 482 S.E.2d 1 (1997). Our Supreme Court allowed the State's petition for discretionary review but later determined it had been improvidently allowed. *State v. Baldwin*, 347 N.C. 348, 492 S.E.2d 354 (1997).

Prior to what would have been his third trial, defendant pled guilty to second degree murder on 10 December 1998. The same day the trial court found by a preponderance of the evidence three aggravating factors and four mitigating factors. The aggravating factors were that defendant (1) knowingly created a great risk of death to more than one person by means of a weapon or device which would normally endanger several persons at once; (2) committed murder during a planned robbery with a motive for pecuniary gain; and (3) failed to render any assistance to the victim and thus showed no

mercy. The mitigating factors were that defendant (1) had no record of criminal convictions; (2) demonstrated an immaturity at the time of the murder that significantly reduced his culpability; (3) gave a statement to law enforcement officers; and (4) was induced to participate in the crime by a co-defendant who provided him with the shotgun. The transcript of the sentencing hearing shows the trial court determined the aggravating factors outweighed the mitigating factors. Therefore, in its judgment and commitment dated 15 December 1998, the trial court sentenced defendant in excess of the fifteen-year presumptive term for second degree murder to forty years' imprisonment, with a credit of 1,626 days already served. *See State v. Melton*, 307 N.C. 370, 373, 298 S.E.2d 673, 676 (1983). Defendant appeals.

Defendant argues the trial court erred in sentencing by finding aggravating factors that "were either not supported by the evidence or were not proper factors in aggravation." The Fair Sentencing Act (FSA), which has since been repealed and replaced by structured sentencing, applies to this case as the crime occurred prior to 1 October 1994. *See* N.C. Gen. Stat. § 15A-1340.10 (1999) (structured sentencing applies to certain criminal offenses that occur on or after 1 October 1994). Under the FSA, the trial court "must impose the statutorily set presumptive sentence unless [it] properly makes written findings of aggravating or mitigating factors and then finds that one set of factors outweighs the other." *State v. Teague*, 60 N.C. App. 755, 757, 300 S.E.2d 7, 8 (1983). This is true even where defendant has pled guilty to the crime for which he is sentenced. "The mere fact that a guilty plea has been accepted pursuant to a plea bargain does not preclude the sentencing court from reviewing all of the circumstances surrounding the admitted offense in determining the presence of aggravating or mitigating factors." *Melton*, 307 N.C. at 377, 298 S.E.2d at 678.

Our Court has examined in detail the procedure for a trial court to find aggravating and mitigating factors under the FSA:

As long as they are not essential to the establishment of elements of the offense, all circumstances that are both transactionally related to the offense and reasonably related to the purposes of sentencing *must* be considered by the sentencing judge. The trial judge *may* consider aggravating and mitigating factors supported by evidence not used to prove an essential element as long as those factors are reasonably related to the purposes of sentenc-

ing. The factors found must be supported by a preponderance of the evidence. The balancing of the properly found factors in aggravation and mitigation is left to the sound discretion of the trial judge.

*Teague*, 60 N.C. App. 757-58, 300 S.E.2d at 8-9 (citations omitted) (emphasis in original); *see also State v. Davis*, 58 N.C. App. 330, 333-34, 293 S.E.2d 658, 660-61, *disc. review denied*, 306 N.C. 745, 295 S.E.2d 482 (1982) (discussing the discretionary task of weighing mitigating and aggravating factors).

**[1]** Defendant first contends "[t]he trial court's finding that defendant created a great risk of death to more than one person is not supported by the evidence." In *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984), our Supreme Court stated that this statutory aggravating factor "addresses essentially two considerations: a great risk of death knowingly created and the weapon by which it is created." *Id.* at 497, 313 S.E.2d at 517. The *Moose* Court "h[e]ld that a shotgun falls within the category of weapon envisioned [by the statute]," *id.* at 498, 313 S.E.2d at 518, primarily for the reason that "it is capable of firing more than one, and in fact, many projectiles in a pattern over a wide impact area rather than a specifically aimed single projectile such as from a rifle or pistol," *id.* at 497, 313 S.E.2d at 517. *But see State v. Bethea*, 71 N.C. App. 125, 129-30, 321 S.E.2d 520, 522 (1984) ("While we do not minimize the danger that a loaded rifle presents to the public, especially in a setting such as a metropolitan area courthouse square, we do not feel that a .30-.30 lever action rifle was a weapon contemplated by [the statute]."). Defendant in this case used a sawed-off shotgun during the crime, and a shotgun has the "destructive capabilities" to be a qualifying weapon under this aggravating factor. *Moose*, 310 N.C. at 497-98, 313 S.E.2d at 517-18.

The remaining question concerns "the risk element," requiring that the defendant "knowingly created a great risk of death to more than one person" in using the weapon. *Id.* at 496-97, 313 S.E.2d at 516. In *Moose*, the Court found there was a great risk of death knowingly created where the shotgun was fired into a vehicle occupied by two persons. *Id.* at 497, 313 S.E.2d at 517. Similarly in *State v. Rose*, 327 N.C. 599, 398 S.E.2d 314 (1990), our Supreme Court made the same finding where the defendant fired a shotgun at a victim who was sitting on a couch with two other people. *Id.* at 606, 398 S.E.2d at 318.

Although the facts in this case are even closer than in *Moose* and *Rose*, the risk element is satisfied where defendant brandished a

sawed-off shotgun and deliberately pointed it at both Woods and Burnette in a hotel that, according to the testimony of a city police identification technician, had dimensions of approximately 12-½ by 13-½ feet. Furthermore, according to Woods's testimony, the man wearing the ball cap was sitting on the same bed as Burnette when she was shot. We note that the proximity of all persons in the room was questioned in great detail by the trial court during sentencing. Also, a forensic pathologist testified the approximate distance between defendant and Burnette at only "five to six feet" when she was shot and Woods thought the distance was around four feet. The shotgun had a pistol grip and the barrel was sawed off. Finally, evidence introduced to the effect that the shooting was accidental suggests that a discharge could have occurred when the gun was pointed near other persons. For these reasons, we hold that defendant "knowingly created a great risk of death to more than one person" with the shotgun, and the trial court did not abuse its discretion in finding this aggravating factor.

[2] Defendant next argues the trial court erroneously found the aggravating factor that the murder was committed in the course of a robbery and was motivated by pecuniary gain, for defendant contends "robbery was an essential element of this felony murder case" and evidence necessary to prove an element of the offense may not be used to prove any factor in aggravation. This argument is without merit for the reason that defendant pled guilty to and was sentenced for second degree murder, which does not require robbery as an element. *See Melton*, 307 N.C. at 375, 298 S.E.2d at 677 (to prove second degree murder, "the state must prove beyond a reasonable doubt only that the defendant unlawfully killed the deceased with malice"). The facts of this case support second degree murder wholly independent of any attempted robbery or other felony. *See, e.g., State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984) ("The intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice."); *State v. Hodges*, 296 N.C. 66, 72, 249 S.E.2d 371, 374 (1978) (evidence showing defendant intentionally inflicted a wound with a deadly weapon which caused death "raises inferences of an unlawful killing with malice which are sufficient [to establish] murder in the second degree").

[3] Finally, defendant argues the trial court erred in finding a nonstatutory aggravating factor in "failing to render aid to the victim, as this is not a factor properly used to distinguish defendant from others convicted of second degree murder [and it improperly uses evidence

to prove the offense]." The trial court made the following finding of this factor in aggravation:

> The court would find that after discharging the weapon into the female victim as far as it being the same transaction was suspended without mercy and left the victim who at that time was bleeding profusely. He did so without rendering any assistance to her. The court would note for the record that even though others were present that the gravity of the aggravating factor which the court finds is not that the victim did not later receive assistance promptly, but instead by leaving, that the defendant showed no mercy. He left, himself, without rendering aid.

Under the FSA, the trial court was permitted to increase a presumptive sentence in accordance with its written findings of non-statutory aggravating factors, provided the factors were (1) supported by a preponderance of the evidence, *see Davis*, 58 N.C. App. at 334, 293 S.E.2d at 661; (2) "not essential to the establishment of elements of the offense," *see Teague*, 60 N.C. App. at 757, 300 S.E.2d at 8; (3) "reasonably related to the purposes of sentencing," *see id.* at 758, 300 S.E.2d at 8; and (4) not based upon the failure to perform a statutory mitigating factor, *see State v. Coleman*, 80 N.C. App. 271, 276, 341 S.E.2d 750, 753, *disc. review denied*, 318 N.C. 285, 347 S.E.2d 466 (1986) ("[I]t is improper to aggravate a defendant's sentence for his failure to perform an act when the doing of the act would support the finding of a factor in mitigation."); *State v. Church*, 99 N.C. App. 647, 657, 394 S.E.2d 468, 474 (1990) (limiting this rule to only statutory mitigating factors). Defendant contends the trial court's finding cannot be an aggravating factor.

Defendant maintains that the trial court's finding relies upon evidence necessary to prove second degree murder because malice necessarily denotes an absence of mercy and an unwillingness to render aid. In *State v. Reeb*, 331 N.C. 159, 415 S.E.2d 362 (1992), two defendants were convicted of assault with a deadly weapon with intent to kill inflicting serious injury and were sentenced to the maximum of twenty years rather than the presumptive six-year term based upon an aggravating factor that they "mercilessly left the victim who was then bleeding and in great pain, without rendering any type of assistance to her." *Id.* at 180, 415 S.E.2d at 374. The *Reeb* Court allowed the aggravating factor in that it "was not necessary to prove an element of the assault charge." *Id.* at 181, 415 S.E.2d at 374. *See also State v. Applewhite*, 127 N.C. App. 677, 683, 493 S.E.2d 297, 300 (1997) (rely-

ing on *Reeb* to uphold the same aggravating factor in sentences for the non-malice crimes of attempted armed robbery and assault with a deadly weapon inflicting serious injury). According to the Court in *Reeb*, "refusing to help a victim after the crime of assault is complete is not an inherent part of the crime," but "makes the assault more reprehensible" and "may be some evidence of intent to kill." *Reeb*, 331 N.C. at 181, 415 S.E.2d at 374. Defendant distinguishes *Reeb* on the basis that the crime in that case did not require malice.

In *State v. Bates*, 76 N.C. App. 676, 334 S.E.2d 73 (1985), the victim stabbed the defendant in the back during an argument, after which the defendant beat, stabbed, and shot the victim, causing his death. The defendant, who was found on someone's front porch with serious injuries, pled guilty to voluntary manslaughter. The trial court found among three aggravating factors, which outweighed the mitigating factors, that "[t]he defendant left the victim dying in a field and did not seek to have help sent to him." *Bates*, 76 N.C. App. at 678, 334 S.E.2d at 74. Our Court stated "[i]t is error for an aggravating factor to be based on circumstances which are part of 'the very essence' of a crime because 'it can be presumed that the Legislature was guided by this unfortunate fact when it established [the FSA].' " *Id.* (quoting *State v. Higson*, 310 N.C. 418, 424, 312 S.E.2d 437, 441 (1984)). We continued that "[t]he exceptional nature of a defendant['s] 'attempting to secure immediate medical attention for [his victim]' has been noted by the Supreme Court." *Id.* (quoting *State v. Bondurant*, 309 N.C. 674, 694, 309 S.E.2d 170, 183 (1983)). Our Court in *Bates* concluded the trial court had erred in finding as an aggravating factor the defendant's failure to aid his victim. *Id.*; *State v. Irby*, 113 N.C. App. 427, 439, 439 S.E.2d 226, 234 (1994) (applying rule in *Bates* to second degree murder without discussion). By contrast, the *Reeb* decision, which allowed the aggravating factor, distinguished *Bates* on the basis that the defendant in *Reeb* was not severely injured at the time he could have rendered aid to the victim. *See Reeb*, 331 N.C. at 181, 415 S.E.2d at 375.

In this case, defendant was sentenced for second degree murder, and our question is whether failing to aid the victim is "part of 'the very essence' of [second degree murder,]" *Bates*, 76 N.C. App. at 678, 334 S.E.2d at 74, or simply makes the crime "more reprehensible," *Reeb*, 331 N.C. at 181, 415 S.E.2d at 374. As previously stated, second degree murder is the unlawful killing of a human being with malice, and North Carolina recognizes three kinds of malice. First is where the defendant exhibits "a positive concept of express hatred, ill-will

or spite." *State v. McBride*, 109 N.C. App. 64, 67-68, 425 S.E.2d 731, 733 (1993). Second is when an act committed by defendant is "inherently dangerous to human life [and] is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." *Id*. The third kind is where the defendant possesses a "condition of mind which prompts a person to take the life of another intentionally [and] without just cause, excuse, or justification." *Id*.

Looking to the three definitions of malice, it is clearly unlikely that a person evincing the first kind, one who hates or has ill-will or spite for the victim, would offer assistance after inflicting a fatal injury. Next, by definition it is impossible that a person could demonstrate the second kind of malice and also render assistance to the victim, for such aid necessarily shows some "regard for human life and social duty." Finally, as to the third kind of malice, we believe it to be inconsistent with human nature that a person would intentionally take the life of another without just cause, excuse, or justification, and then immediately conjure the opposite intent, being to intentionally save that same life. *See State v. Bondurant*, 309 N.C. 674, 694, 309 S.E.2d 170, 182-83 (1983) ("In no other capital case among those in our proportionality pool did the defendant express concern for the victim's life or remorse for his action by attempting to secure immediate medical attention for the deceased."). Accordingly, we agree with defendant that not helping to save a victim is within the essence of malice, and therefore is inherent in this malice crime of second degree murder. *Cf. State v. Lewis*, 2000 Tenn. Crim. App. LEXIS 253 (failure to render aid to victim tends to show premeditation); *Stephenson v. State*, 205 Ind. 141, 179 N.E. 633 (1932) (failure to render aid included among facts supporting murder conviction).

Furthermore, we cannot say the act of leaving without providing aid to a victim makes murder "more reprehensible," *compare Reeb*, 331 N.C. at 181, 415 S.E.2d at 374, for murder is a violent crime involving the endangerment, not the preservation, of life. *See State v. Higson*, 310 N.C. 418, 424, 312 S.E.2d 437, 441 (1984) ("Inherent in most crimes is an unprovoked, uninvited and unwarranted attack on an unprepared, innocent victim[;] [s]uch is the very essence of violent crime[.]"); *State v. Blackwelder*, 309 N.C. 410, 414, 306 S.E.2d 783, 786 (1983) (the focus for aggravating a crime under the FSA is whether the facts of the case disclose "excessive" wickedness "not normally present in that offense").

**STATE v. BALDWIN**

[139 N.C. App. 65 (2000)]

We therefore hold the trial court's finding as an aggravating factor that defendant left without rendering aid and showed no mercy violates the proscription against aggravating a sentence with evidence "used to prove an essential element" of the crime, namely malice. *Cf. State v. McKinney*, 88 N.C. App. 659, 663, 364 S.E.2d 743, 746 (1988) (although strictly speaking "the use of a deadly weapon is not an essential element of voluntary manslaughter . . . our Supreme Court gave a broader meaning to the term 'element of the offense[.]' "); *State v. Evangelista*, 319 N.C. 152, 165, 353 S.E.2d 375, 384 (1987) (conviction of involuntary manslaughter required finding that defendant was armed with and discharged a firearm, which in effect became an element of the offense, and the same evidence could not be considered as an aggravating factor for sentencing); *State v. Swann*, 115 N.C. App. 92, 97, 443 S.E.2d 740, 743 (1994) (evidence that defendant took a deadly weapon to victim's neighborhood was so closely connected to the evidence implying malice, it was error to consider the use of the pistol again in sentencing); *Blackwelder*, 309 N.C. at 417, 306 S.E.2d at 788 (when evidence of use of deadly weapon is deemed necessary to prove malice, trial court is precluded from using it as aggravating factor at sentencing). We do not reach the questions of whether the trial court's finding was based upon the failure to perform a statutory mitigating factor or was reasonably related to the purposes of sentencing.

"When the trial judge errs in finding an aggravating factor and imposes a sentence in excess of the presumptive term, the case must be remanded for a new sentencing hearing." *State v. Wilson*, 338 N.C. 244, 259, 449 S.E.2d 391, 400 (1994). Resentencing is mandatory even if a single factor in aggravation is improperly applied. *State v. Ahearn*, 307 N.C. 584, 602, 300 S.E.2d 689, 701 (1983). We therefore remand this case for resentencing by the trial court.

Remanded for resentencing.

Judges GREENE and EDMUNDS concur.