STATE OF NORTH CAROLINA v. KYLE O. BERRY

No. 389A01

(Filed 20 December 2002)

**1. Jury— selection—capital trial—qualification for both phases**

An assignment of error in a first-degree murder prosecution concerning potential jurors with reservations about the death penalty was not restricted to the sentencing proceeding even though defendant raised it in that context. A trial court may not select a panel for the guilt-innocence phase with the understanding that different jurors will be substituted at sentencing.

**2. Jury— selection—capital trial—reservations about death penalty—inconsistent answers**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by excusing for cause a prospective juror whose answers were inconsistent but who could not state that he would follow the law if the evidence were circumstantial.

**3. Jury— selection—capital trial—reservations about death penalty—unalterable views**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by excusing a potential juror for cause where she was unalterably opposed to the death penalty. Mere opposition does not disqualify a juror who can set aside her personal beliefs and follow the law; in this case, the court asked an additional question to determine that the opposition was unalterable.

**4. Jury— selection—capital trial—reservations about death penalty—equivocal answers**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by excusing a potential juror for cause where the juror's responses on the death penalty were arguably equivocal, but his final answer indicates that the court properly interpreted his answers as unambiguous opposition to the death penalty regardless of the law or the evidence.

**5. Evidence— prior crimes or acts—prior murder—admissible**

The trial court did not err in a first-degree murder prosecution by admitting evidence of a prior murder where the court carefully studied the substance of the evidence, reviewed the applicable law, considered the arguments of counsel, determined that the probative value was not substantially exceeded by unfair prejudice, determined that the evidence was tendered to establish the permissible factors that defendant killed this witness to silence her, and gave limiting instructions.

**6. Evidence— murder prosecution—gang membership—not prejudicial**

There was no prejudicial error in a capital first-degree murder prosecution in an officer's testimony that this case was assigned to a "gang unit" where the attorneys and judge mistakenly thought that the door had been opened, but the witness made only a single brief reference and there was no indication that the outcome of the trial would have been any different without the testimony.

**7. Evidence— gang nickname and involvement—not prejudicial**

In light of evidence of defendant's guilt, there was no prejudicial error in a first-degree murder prosecution from evidence about defendant's gang nickname, testimony that a witness was afraid of defendant's friends, testimony that the victim was in a gang with defendant, testimony that a cellmate did not like to sleep with defendant in the room, and testimony that an EMT first saw defendant in a group which the EMT thought may have been up to no good.

**8. Constitutional Law— effective assistance of counsel—concession of guilt—Harbison waiver—not conditional—insanity plea not pursued—concession still valid**

The trial court in a capital first-degree murder prosecution was justified in assuming that a Harbison waiver remained valid throughout the trial where the waiver was given in anticipation of an insanity plea, defendant's opening argument admitted possible participation but argued insanity, and the insanity plea was not pursued after the prosecution revealed new evidence during the trial. Defendant did not expressly or impliedly condition his consent to acknowledge guilt upon presentation of an insanity defense and never formally withdrew his plea.

**9. Discovery— criminal—statement revealed during trial—no sanctions**

The trial court did not err during a capital first-degree murder prosecution by not imposing sanctions where the State revealed a statement during trial which defendant suggested would have changed the decision to enter an insanity plea. Defendant received the substance of this statement through another statement that was provided to defendant, and no *Brady* violation occurred.

**10. Criminal Law— prosecutor's argument—impact on murder victim's family**

The trial court in a capital first-degree murder prosecution did not abuse its discretion by overruling defendant's objection to the prosecutor's comments about the 16-year-old victim's age, her expression, the fact that her parents are left with only photographs and memories, and his speculation that the victim may have married and had children. The life the prosecutor posited for the victim was a conventional one.

**11. Criminal Law— prosecutor's argument—vouching for another prosecutor**

There was no prejudicial error in a capital first-degree murder prosecution where the prosecutor in his closing argument came perilously close to vouching for another prosecutor, but abandoned the argument after defendant's objection, even though the objection was overruled.

**12. Criminal Law— prosecutor's argument—prior murder victim raped**

There was no error in a capital first-degree murder prosecution where the prosecutor suggested in his closing argument that a prior murder victim had been raped. The prosecutor's argument was triggered by defendant's cross-examination of a witness, the focus of the prosecutor's argument was on information from the witness that was not known to the public, and the argument represented a permissible inference of motive rather than an appeal to passion.

**13. Criminal Law— prosecutor's argument—acquittal putting others at risk**

There was no prejudicial error in a capital first-degree murder prosecution in light of the evidence of defendant's guilt where the prosecutor improperly argued that an acquittal would put others at risk, but the improper comment consisted of a single sentence and was abandoned immediately.

**14. Sentencing— capital—aggravating circumstance—course of conduct—instruction**

There was plain error in a capital sentencing proceeding where the court's instruction on course of conduct allowed the jury to find the aggravating circumstance based on a prior murder without finding that the past and present murders were part of a course of conduct.N.C.G.S. § 15A-2000(e)(11).

**15. Sentencing— capital—aggravating circumstances— overlapping**

There was sufficient evidence in a capital sentencing proceeding to support the overlapping aggravating circumstances that the murder was committed to avoid arrest and that the murder was part of a course of conduct. Each circumstance was offered for a different purpose and there was separate and substantial evidence to support each circumstance individually. N.C.G.S. § 15A-2000(e)(11), N.C.G.S. § 15A-2000(e)(4).

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Lanier, J., on 30 March 2001 in Superior Court, New Hanover County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 14 October 2002.

STATE v. BERRY

[356 N.C. 490 (2002)]

*Roy Cooper, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Thomas K. Maher for defendant-appellant.*

EDMUNDS, Justice.

Defendant Kyle Berry was indicted for the first-degree murder of Margaret Theresa Fetter. He was convicted on the basis of premeditation and deliberation and sentenced to death.

The State presented evidence that Timothy Ratliff was eating at a McDonald's restaurant in Wilmington on 5 November 1998. He was approached by Bobby Autry, who asked for a cigarette. Autry, accompanied by Theresa Fetter, the victim, later returned to Ratliff and asked Ratliff to rent a motel room for him. They all drove to a Motel Six on Market Street, where Fetter provided funds to Ratliff. Ratliff entered the motel, rented a room, and gave the receipt to Fetter.

Later that same day, Erwin Hegwer received a telephone call from his step-grandson, Jon Malonee. In response to the call, Hegwer drove to the Motel Six, where he picked up Malonee, defendant, Autry, Josh Whitney, and Fetter. He dropped them off at the parking lot of the Food Lion grocery store at Seventeenth Street and South College Road in Wilmington. Malonee later called Hegwer again about 1:30 a.m. on 6 November 1998. Hegwer drove to New Hanover Regional Hospital, where he picked up Malonee, defendant, and Autry and took them back to the Motel Six. When he asked where "the girl" was, he was told that Whitney had driven her home.

Defendant and the others were at the hospital because defendant's hand had been lacerated. Emergency medical technicians (EMTs) had responded to the Food Lion parking lot at approximately 12:30 a.m. Defendant left a group of people, approached the EMT vehicle, and displayed the cut. A Wilmington police officer who had also responded asked defendant about the injury. Defendant reported that he had fallen behind the Food Lion while walking home from a friend's house. He could neither name the friend nor describe where the house was, and the officer was unable to find any glass or other material that might have caused the injury. The EMTs bandaged defendant's hand and transported him to the hospital, where he was examined by Dr. Thomas E. Parent, an orthopedic surgeon who specializes in hand surgery. Dr. Parent later operated on defendant's hand on 11 November 1998. It was Dr. Parent's opinion as an expert

in the field of orthopedic treatment and surgery that defendant's injury did not result from a fall, but was consistent with defendant having been cut by a knife.

Fetter's body was found on 24 November 1998. At that time, Autry was incarcerated in the New Hanover County jail. Autry had spoken with Wrightsville Beach Police Officer Hovie Pope on 23 November 1998, and as a result of the conversation, Pope checked Autry out of jail the next day. They drove to an area near Seventeenth Street and South College Road, where they walked down a trail into a wooded lot and observed a badly decomposed corpse. The body was near the SPEC day care center, not far from the Food Lion on Seventeenth Street and South College Road. Being unsure which agency had jurisdiction, Officer Pope called investigators from both the New Hanover Sheriff's Department and the Wilmington Police Department. When the investigators arrived, Officer Pope showed them pieces of pipe and a knife, all of which he had observed at the scene. Wilmington Police Detective Thomas Witkowski recovered a twenty-four-inch piece of pipe near the body and a forty-eight-inch piece of pipe at the back of a nearby parking area. He also discovered a folding knife with a red handle. SBI Agent Dennis Honeycutt sprayed the area with luminol, a chemical that reacts to blood, and saw indications of a blood trail near the point where the victim's body was found.

In a pocket of Fetter's pants, investigators found a receipt from the Motel Six dated 5-6 November 1998, in the name of Timothy Ratliff. The autopsy of Fetter's body was conducted by Dr. John Butts, who noted two cutting injuries to the left forehead. He also observed broken bones around the left eye and two breaks in the left jaw, which he characterized as blunt-force injuries. Indentations in the left rear of the victim's skull indicated to him that she had been twice struck with a sharp object. In addition, he observed injuries to the victim's hands, which he characterized as defensive wounds suffered as she tried to ward off blows. The victim's lungs showed signs of infection or pneumonia, indicating that the head injuries had not killed her outright. Dr. Butts' expert opinion was that she died as a result of blunt-force injuries.

Defendant made a number of statements to others about the murder. In so doing, he explained that he killed Fetter to keep her from talking about a murder he had previously committed on 17 or 18 September 1998. During a conversation with his friend David Surles, defendant said he had seen a woman, later determined to be Lisa

Maves, while at the beach. He related that the woman was upset, so he talked with her and had sex with her. Defendant then said that the woman afterwards was "freaking out," so he stabbed her in the head with a bottle. Defendant told Surles that Fetter knew about this earlier killing of Lisa Maves and that he slit Fetter's throat to keep her from telling about it. Defendant stated that he had dumped Fetter's body behind the SPEC building. In his court testimony about this conversation, Surles added that defendant's nickname, "Crazy K," came from "gang members and stuff."

Marvin Harper testified that while he was in the New Hanover County jail, he heard defendant and Josh Whitley talking about the killing of a young girl who was found on Highway 132. Harper also heard defendant say that he killed the girl found on Highway 132 because he knew she would testify against him about the girl on the beach.

Paul Venth testified that he had shared a jail cell with defendant in August and September 1999. Defendant told Venth about an incident when he and Jon Malonee were with a woman on the beach. When the woman became angry, defendant said he stabbed her in the side of the head, and the knife became stuck. He added that stabbing someone in the head was quick, efficient, and silent, and that the killing had made him feel good. Defendant related that he and Malonee put her body in the water but the tide washed it ashore. Defendant also stated that he killed Fetter to keep her from talking about the earlier murder and about other crimes of his with which she was familiar. Defendant said Fetter was led into the woods where Bobby Autry hit her first with a metal bar. When defendant tried to stab her, his folding knife closed over his fingers and cut his hand so badly that he had to go to the hospital. Defendant added that when he and others returned to the scene the next day, Fetter had apparently crawled a short distance, so they moved the body back and covered it with leaves.

Rachael Williams testified that she had been Fetter's friend. In October 1998, Fetter told Williams that she knew that Jon Malonee and defendant were involved in a murder at Wrightsville Beach and feared that they were going to try to kill her.

The State provided evidence to corroborate defendant's admissions that he had participated in the murder of Lisa Maves. Dr. John Almeida, an expert in forensic pathology, conducted the autopsy. He testified that Maves had two stab wounds to the

head, one of which had penetrated the brain. He also found symptoms of other blunt-trauma wounds to the head. In his opinion, Maves died as a result of the blunt trauma. He added that stab wounds to the head are unusual.

Defendant was indicted for the first-degree murder of Fetter. He was also indicted for the murder of Maves, but the trial court denied the State's motion to join the cases for trial. However, the court did permit the State to present evidence of the Maves killing during defendant's trial for the murder of Fetter. In preparation for trial, defense counsel filed notice of intent to rely on the defense of insanity. Accordingly, defendant was evaluated at Dorothea Dix Hospital in Raleigh. On 15 February 2001, defendant was picked up at Dix by officials of the New Hanover County Sheriff's Department for return to Wilmington. Despite being shackled, defendant escaped from the deputies' van when it reached Wilmington but was apprehended about an hour and a half later.

Although defendant had provided notice of a proposed defense of insanity and predicted such a defense to the jury during his opening statement, he did not present evidence during the guilt-innocence portion of his trial. On 23 March 2001, defendant was convicted of the first-degree murder of Theresa Fetter on the basis of premeditation and deliberation. The State did not offer additional evidence during the sentencing proceeding. Defendant presented evidence of mental disorders not amounting to insanity. Other evidence indicated that defendant suffered from substance-abuse problems and was impaired at the time of the offense. Defendant also adduced evidence that a head injury suffered in an earlier automobile accident had led to changes in his personality.

At sentencing, the jury found the aggravating circumstances that the murder was especially heinous, atrocious, or cruel; that the murder was part of a course of conduct including other crimes of violence against another person or persons; and that the murder was committed to prevent arrest or to effect defendant's escape. The jury also found the statutory mitigating circumstances that the murder was committed while defendant was under the influence of a mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. In addition, the jury found six nonstatutory mitigating circumstances and the catchall mitigating circumstance. The jury then found that the mitigating circumstances were insufficient to outweigh the aggravating circum-

stances and recommended a sentence of death. Sentence was imposed on 30 March 2001.

## JURY SELECTION ISSUES

[1] Defendant argues that the trial court improperly excused for cause three prospective jurors who expressed reservations about imposing the death penalty. We note at the outset that defendant has raised this assignment of error in the context of the sentencing proceeding, and one comment by defense counsel to the court during *voir dire* suggested that a juror might be qualified as to the guilt-innocence phase only. However, we have held that a trial court may not select for the guilt-innocence phase of a trial a panel of jurors, some of whom oppose the death penalty while others are not so opposed, with the understanding that different jurors, all of whom are unopposed to the death penalty, will be substituted for the sentencing proceeding. *State v. Bondurant*, 309 N.C. 674, 681-82, 309 S.E.2d 170, 175-76 (1983); *see also* N.C.G.S. § 15A-2000(a)(2) (2001). Accordingly, we will not restrict our consideration of this assignment of error to the sentencing proceeding.

A prospective juror may be excused for cause when "[a]s a matter of conscience, regardless of the facts and circumstances, [the juror] would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (2001). A prospective juror is not disqualified for having strong feelings against the death penalty as long as the juror can put those feelings aside and apply the law. *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993). However, where a prospective juror indicates that he or she cannot follow the law as given by the trial judge's instructions, it is error not to excuse that prospective juror. *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992).

"[T]o determine whether a prospective juror may be excused for cause due to that juror's views on capital punishment, the trial court must consider whether those views would '["]prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.["]' *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) [(quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980))]." *State v. Bowman*, 349 N.C. 459, 469-70, 509 S.E.2d 428, 435 (1998), *cert. denied*, [527] U.S. [1040], [144] L. Ed. 2d [802] (1999).

*State v. Hedgepeth,* 350 N.C. 776, 794, 517 S.E.2d 605, 616 (1999) (first through fourth alterations in original), *cert. denied,* 529 U.S. 1006, 146 L. Ed. 2d 223 (2000). A judge may excuse a prospective juror who has not been challenged by either party if the judge determines that grounds for a challenge for cause are present. N.C.G.S. § 15A-1211(d) (2001). Challenges for cause lie within the discretion of the trial court and are reviewed for abuse of discretion. *State v. Kennedy,* 320 N.C. 20, 28-29, 357 S.E.2d 359, 364 (1987).

[2] Defendant first contends that prospective juror Powell was improperly excused. When Powell initially was questioned by the court, he stated that he could follow the evidence and the law and that he thought the death penalty was an acceptable punishment. The prosecutor then used *voir dire* to walk Powell through a capital trial and sentencing proceeding, at the conclusion of which Powell reiterated that he thought he could fairly apply the law. The prosecutor next discussed the nature of circumstantial evidence and advised Powell that the State would present circumstantial evidence both to establish defendant's intent and also as to "other evidence." Referring to sentencing, Powell responded, "If there were no direct evidence, it was all circumstantial, I don't know if I could do that." The prosecutor continued:

> Q. So even if you were convinced, beyond a reasonable doubt, that he was—there was an aggravating factor—first of all, he was guilty.
>
> A. Okay.
>
> Q. And if you were convinced, beyond a reasonable doubt, that the aggravating factor existed and it outweighed the mitigating factors, and it was substantially sufficient to call for the death penalty, in a circumstantial evidence case, you would not be able to—
>
> A. No, I can't do that.

At that point, defense counsel then asked the court to provide prospective juror Powell with the pattern instruction on the difference between direct and circumstantial evidence. The prosecutor moved to strike Powell for cause. The court denied the State's motion, recited to the prospective juror the pattern instruction requested by defense counsel, and the colloquy continued:

[PROSPECTIVE JUROR POWELL]: For me to decide between life or death of an individual, I know what the law says.

THE COURT: Okay.

[PROSPECTIVE JUROR POWELL]: But I'm going to have to have some direct evidence. If it were 100 percent circumstantial, I don't think I could do that.

THE COURT: All right. I'm going to allow it for cause.

The court denied defendant's motion to rehabilitate prospective juror Powell.

We have held that there is no distinction between the weight to be given to direct and circumstantial evidence.

> Circumstantial evidence and direct evidence are subject to the same test for sufficiency, *State v. Sokolowski*, 351 N.C. 137, 143, 522 S.E.2d 65, 69 (1999), and the law does not distinguish between the weight given to direct and circumstantial evidence, *State v. Adcock*, 310 N.C. 1, 36, 310 S.E.2d 587, 607 (1984). " 'Premeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence.' " *Sokolowski*, 351 N.C. at 144, 522 S.E.2d at 70 (quoting *State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994), *and overruled on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001)).

*State v. Parker*, 354 N.C. 268, 279, 553 S.E.2d 885, 894 (2001), *cert. denied*, —— U.S. ——, 153 L. Ed. 2d 162 (2002). Because the prospective juror was unable or unwilling to state that he would follow the law, the court properly allowed the motion to strike for cause. Although prospective juror Powell's answers were not consistent during *voir dire*, in that he sometimes stated that he could follow the law, while other times he qualified his answers by adding that he would require more than circumstantial evidence, "[t]he trial court has the opportunity to see and hear a juror and has the discretion, based on its observations and sound judgment, to determine whether a juror can be fair and impartial." *State v. Dickens*, 346 N.C. 26, 42, 484 S.E.2d 553, 561 (1997). In light of Powell's final assertion that he could not follow the law if the evidence were circumstantial, the trial court did not abuse its discretion in excusing him for cause.

**[3]** Defendant next contends that prospective juror Bixby was improperly excused for cause. When she was called into the jury box, the trial court commented on the fact that she was a teacher and asked her if she had heard the initial instructions given to all prospective jurors in the case. Bixby responded by pointing out potential scheduling conflicts:

[PROSPECTIVE JUROR BIXBY]: . . . I didn't realize—you never mentioned how long this was going to take for the trial period, and I have reservations for school vacation which begins the 11th, and I also have an appointment for a sleep apnea test on the 25th and [2]6th of March that I've waited for since the beginning of January.

THE COURT: Since the beginning of last June?

A. January.

Q. Last January, all right. All right, I've got one question I've got to ask before we go any further. What are Gold Wing Road Riders?

A. Motorcycle club.

Q. You're a member of a motorcycle gang?

A. Uh-huh.

Q. Okay.

A. That's just a spark of my life.

Q. Well, my brother is into that. I see here you do not believe in the death penalty.

A. No.

Q. Is that an unalterable belief?

A. Yes. I'm Roman Catholic and I don't believe in it.

THE COURT: All right. I'm going to excuse you for cause. You're free to go.

[DEFENSE COUNSEL]: Objection. And motion to rehabilitate.

THE COURT: Okay.

[DEFENSE COUNSEL]: Thank you.

THE COURT: Maybe we ought to say cause and personal hardship. That will make it look a bit better.

Defendant correctly points out that mere opposition to the death penalty does not disqualify a prospective juror if the juror can set aside his or her personal beliefs and follow the law. However, the court here asked an additional question and determined that prospective juror Bixby's opposition was unalterable. A prospective juror who will not follow the law may be excused for cause. "A juror is properly excused for cause based on his views on capital punishment if those views would prevent or impair the performance of his duties as a juror in accordance with his instructions and his oath." *State v. Richardson*, 346 N.C. 520, 529-30, 488 S.E.2d 148, 153 (1997) (citing *Wainwright v. Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52), *cert. denied*, 522 U.S. 1056, 139 L. Ed. 2d 652 (1998). Accordingly, the court did not abuse its discretion in excusing prospective juror Bixby for cause.

[4] Finally, defendant argues that prospective juror Smith was improperly excused for cause. When Smith was called to the jury box, the following exchange ensued:

THE COURT: All right, Mr. Smith, good afternoon.

[PROSPECTIVE JUROR SMITH]: Good afternoon.

Q. I see here from your jury questionnaire that you are telling me that you are opposed to capital punishment.

A. Yes.

Q. All right. Now, the State of North Carolina does not require its citizens to take one view or the other. You're free to believe ever how [sic] you want to on the issue of capital punishment, because it is a matter about which reasonable minds can differ. However, the law of this state is that, for first degree murder, some first degree murder, not every first degree murder, the state has declared that, for certain first degree murders, capital punishment is an appropriate punishment. Now, the test as to whether or not you can serve as a juror in this case is whether or not you can put aside your personal feelings and follow the law of this state as I give it to you in making a determination as to the guilt or innocence of this defendant. And then, if we reach the sentencing phase, to properly and fairly weigh both possible penalties, both the death penalty and life in prison without parole. So you're the only one that knows.

So can you follow the law, or are your feelings and your—or your moral tenets such that it would be impossible for you to follow the law?

A. Would you repeat that?

Q. I say, knowing that the law of North Carolina is that the death penalty is considered an appropriate punishment for some first degree murders, the question whether you're suitable for this case or not is not what you believe, but whether you can follow the law, in spite of what you believe. You know that. You're the only one that knows. I mean, can you set aside your personal beliefs against the death penalty in this particular case and base your decision on the law of North Carolina and the evidence that you hear from the witness stand?

A. I don't know.

Q. Okay. What do you think?

A. Based on what I believe?

Q. Yes, sir.

A. I believe that an individual that's found guilty should spend the rest of his life in prison.

Q. So, in other words, if you were on this jury and it got to the sentencing phase, you would automatically vote for life imprisonment without parole?

A. I believe I would.

Q. Okay. You could not even consider the other possibility of the death penalty?

A. It would probably be hard to consider.

Q. Okay. Well, hard is—I hope it's hard for everybody to consider, because it's serious, it's a serious decision; but the question is, can you fairly consider both possible punishments, or are your feelings such that you would automatically vote for life in prison?

A. I think I would possibly vote for life in prison.

Q. Regardless of what the evidence was?

A. I think I would.

Q. Okay. And regardless of what the law is?

A. I think I would.

Q. All right. Well, I appreciate your telling it to us just like it is.

THE COURT: And I think he is unequivocal in his opposition. I am going to excuse him for cause. Mr. Weber?

[DEFENSE COUNSEL]: Judge, we would like to object and move to rehabilitate and ask the court to inquire as to his ability to sit at guilt/innocence.

THE COURT: Okay. Well, your motion to rehabilitate is denied, but I will—Would you have any problem in just sitting in the guilt/innocence phase, knowing if you find him guilty, the next step is to determine punishment?

[PROSPECTIVE JUROR SMITH]: I think that I probably could, but you do understand that that would still be my stand?

THE COURT: I understand. Thank you very much.

The court's original questions correctly set out the law and a juror's responsibility to follow the law, even where it conflicted with the juror's individual beliefs. Although prospective juror Smith's answers are arguably equivocal in that he said only that he "thought" he would respond in a certain way, his final comment to the court about his "stand" indicates that the court properly interpreted his earlier answers as unambiguous opposition to the death penalty regardless of the law or evidence. *See State v. Syriani*, 333 N.C. 350, 371, 428 S.E.2d 118, 128-29, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). The experienced trial court was in the best position to observe this prospective juror and to evaluate his answers, *State v. Dickens*, 346 N.C. at 42, 484 S.E.2d at 561, and did not abuse its discretion in excusing Smith. This assignment of error is overruled.

## GUILT-INNOCENCE ISSUES

[5] Defendant argues that the trial court erred in admitting irrelevant and unfairly prejudicial evidence relating to the slaying of Lisa Maves. Defendant's position is that the evidence was unnecessarily inflammatory, especially in light of defendant's tactical decision to concede at trial some participation in Fetter's murder.

Only relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (2001). Relevant evidence is "evidence having any tendency to make

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2001). Even relevant evidence may be inadmissible if the probative effect of the evidence is substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (2001). However, the balancing of these factors lies "within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001).

Even if a trial court concludes that evidence of a defendant's other crimes or bad acts is admissible under Rule 403, the court must then determine whether the evidence should be excluded pursuant to Rule 404, which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2001). We have held that Rule 404(b) is a rule of inclusion, subject to the single exception that such evidence must be excluded if its *only* probative value is to show that defendant has the propensity or disposition to commit an offense of the nature of the crime charged. *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

The record shows that the trial court considered the admissibility of the evidence pertaining to Lisa Maves at the beginning of the trial. After the prosecutor made an oral proffer of the evidence, the court allowed defendant to be heard in opposition. The court then advised counsel that it had reviewed the relevant cases and concluded that the evidence was admissible pursuant to Rule 404(b). The court added that it would provide the jury with a limiting instruction at the proper time. Accordingly, when the prosecutor first introduced evidence related to Lisa Maves through witness David Surles, the court instructed as follows:

Ladies and gentlemen, the State of North Carolina is starting to offer evidence of the conduct of the defendant which occurred before the offense for which he is being tried, okay. Now, this evidence is offered for a very limited purpose and may be considered by you only for that limited purpose. The purpose for which this evidence is offered is to establish the intent of the defendant, which is a necessary element of the crime charged in this case, as well as his motive and knowledge. It is the jury's responsibility to determine if this evidence does, in fact, show all or any or none of those things. You are to consider this evidence solely for the purpose of establishing the motive, intent, knowledge of the person or persons responsible for the death of [the victim]. All right.

The court gave similar instructions before the testimony of State's witnesses Marvin Harper and Paul Venth.

Based on this record, we find no error in the court's admission of the evidence. Although defendant correctly characterizes the evidence of the Maves murder as prejudicial, the test is whether the prejudice was unfair. *See* N.C.G.S. § 8C-1, Rule 403. The trial court showed exemplary caution in its handling of this evidence. It carefully studied the substance of the evidence, reviewed the applicable law, and considered the arguments of counsel before determining that the probative value of the evidence was not substantially exceeded by any unfairly prejudicial impact. After determining that Rule 403 did not require exclusion of the evidence, the court then considered whether the evidence was being offered for a proper purpose under Rule 404, to establish defendant's intent, motive, and knowledge. Defendant's comments to others that he killed Fetter to prevent her from talking about the Maves murder readily fits all three of these permissible purposes.

Defendant cites *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986), and *State v. Mills*, 83 N.C. App. 606, 351 S.E.2d 130 (1986), to support his argument that evidence of the Maves murder was not admissible. In *Morgan*, the defendant in a murder case claimed he shot the victim in self-defense. *State v. Morgan*, 315 N.C. at 631, 340 S.E.2d at 88. While conducting his recross-examination of the defendant, the prosecutor asked about a separate incident when the defendant had pointed his shotgun at others. *Id.* Apparently, the prosecutor did not seek a ruling on the admissibility of this evidence prior to trial, the trial court did not conduct a weighing test pursuant to Rule 403, and defendant did not request a limiting instruction. *Id.* at 632,

640, 340 S.E.2d at 88, 93. The State argued that the evidence rebutted the defendant's claim that he was acting in self-defense when he shot the victim. We held that it was error for the trial court to allow the prosecutor's cross-examination of the defendant, undertaken for the purpose of establishing that the defendant's character for violence negated his claim of self-defense. *Id.* at 639, 340 S.E.2d at 93. A similar scenario arose in *State v. Mills*, with the significant difference that the State sought to disprove the defendant's claim of self-defense by offering evidence of a prior assault by the defendant on the same victim. *State v. Mills*, 83 N.C. App. at 609-10, 351 S.E.2d at 132. The Court of Appeals, citing *Morgan*, held that the evidence was not admissible under Rule 404(b). *Id.* at 611-12, 351 S.E.2d at 133-34.

*Morgan* and *Mills* are distinguishable. In both those cases, the evidence was offered only to show that, at the time of the offenses in question, the defendant was acting in conformity with his aggressive character. In the case at bar, the evidence was tendered to establish the permissible factors that defendant knowingly and intentionally killed Theresa Fetter in order to silence her. This assignment of error is overruled.

[6] Defendant argues that the trial court improperly admitted prejudicial evidence that defendant was a member of a gang. Defendant cites the testimony of Wilmington Police Lieutenant Maultsby, who testified that the case was assigned to the "gang unit"; Surles' testimony that defendant had a gang nickname; Williams' testimony that the victim was in the gang; EMT Eric Kasulis' testimony that he first observed defendant at the Food Lion parking lot in a group that might have been up to no good; and Venth's testimony that he did not like being asleep in his cell with defendant.

Lieutenant Maultsby testified that after the victim's body was found, his agency assumed responsibility for the investigation. During his direct examination, the following exchange took place:

[PROSECUTOR]: Okay. And did you—what did you do next?

A. I stood by for a period of time to oversee the processing. I requested our ID technicians come out. Captain Carey, who was my supervisor, also arrived, and we discussed some other avenues as far as processing the crime scene. I know that Sergeant Clatty, who was assigned to the gang unit—

[DEFENSE COUNSEL]: Objection, Judge. We need to voir dire this witness at this juncture.

STATE v. BERRY

[356 N.C. 490 (2002)]

THE COURT: Approach the bench.

**(A BENCH CONFERENCE WAS HELD AS FOLLOWS:)**[1]

THE COURT: All right, folks, this gang business has already been brought up because y'all said she had to get beat out of it.

[DEFENSE COUNSEL]: [Co-counsel] made the objection, not me.

[DEFENSE COUNSEL]: The door has been opened. I didn't know how far down the road with this gang thing we were going.

[PROSECUTOR]: Y'all opened the door.

THE COURT: We'll go some distance because the door is there.

[DEFENSE COUNSEL]: It's not in evidence. I realize that, but neither is the admission that you made in your opening statement as to [defendant's] sanity, but the jury knows it.

[DEFENSE COUNSEL]: We can't put the toothpaste back in the tube.

THE COURT: That's right.

THE COURT: You may answer the question.

Q. Go ahead, Officer Maultsby.

A. I had requested Sergeant Clatty, who is also assigned to our unit, to bring a video camera that they had acquired. We also contacted some members of the traffic unit who had some laser technology, for the purpose of getting accurate measurements, since this was a large wooded lot.

Defendant accurately argues that, despite everyone's mistaken recollections to the contrary during the bench conference, the door had not yet been opened because the earlier references to gang activity had taken place outside the presence of the jury. However, the transcript reveals that during his entire testimony, Lieutenant Maultsby made this single brief reference to gangs, and defendant objected immediately. Although the court overruled the objection, Lieutenant Maultsby never again spoke of gangs. In light of the fact that the witness did not testify that defendant was part of a gang or even make a direct connection between Sergeant Clatty's formal

---

1. Although it appears that the speakers may not be correctly identified in the following exchange, we have quoted from the official trial transcript.

STATE v. BERRY

[356 N.C. 490 (2002)]

assignment and his participation in this investigation, and the fact that Lieutenant Maultsby thereafter addressed only the details of the investigation, we are unable to hold that defendant has shown that the outcome of the trial would have been any different if this evidence had been excluded. *See* N.C.G.S. § 15A-1443(a) (2001); *see also State v. Williams*, 355 N.C. 501, 538, 565 S.E.2d 609, 631 (2002); *State v. Braxton*, 352 N.C. 158, 183, 531 S.E.2d 428, 442-43 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001).

[7] Defendant claims that witness Surles' testimony as to defendant's nickname was prejudicial. The record shows that the matter was first broached on cross-examination:

[DEFENSE COUNSEL]: Now, Mr. Surles, you did know [defendant] good enough to know what his nickname is, don't you?

A. Yes.

Q. Okay. What's his nickname?

[PROSECUTOR]: Objection.

THE COURT: Overruled.

A. Crazy K.

[DEFENSE COUNSEL]: I have no further questions.

THE COURT: Okay.

**REDIRECT EXAMINATION BY [THE PROSECUTOR]:**

Q. Do you know where he got the nickname?

A. No, I do not.

Q. How would you describe your friendship—

ALTERNATE JUROR THREE: We couldn't hear the nickname.

THE COURT: What did you say his nickname was?

THE WITNESS: Crazy K.

. . . .

Q. How did you know his nickname is Crazy K?

A. Just from past people.

Q. From past people?

A. Yes, sir.

Q. Did he ever call himself Crazy K?

A. Yes, sir.

Q. Did he tell you where it came from?

A. No, sir.

Q. Did you—who were these past people?

A. Past gang members and stuff.

Q. Whose gang members?

A. People that he associated with.

Q. Do you know if he was in a gang?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

Q. What people did he associate with?

[DEFENSE COUNSEL]: Objection.

THE COURT: I think he can give names, if he's got them.

THE WITNESS: I can't remember exactly what names, but I know as far as the Crips.

Q. Who were the Crips?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]: Your Honor, he opened the door.

THE COURT: Hmm.

[PROSECUTOR]: He asked about the nickname.

[DEFENSE COUNSEL]: All I asked about was the nickname.

THE COURT: That's right.

Q. Do you know what that nickname is—strike that. Do you know where the nickname comes from?

[DEFENSE COUNSEL]: Objection. He answered that already.

THE COURT: Approach the bench.

**(A BENCH CONFERENCE WAS HELD AS FOLLOWS:)**

THE COURT: All right, I thought I had previously ruled that we're not going to get into any extensive discussions of gang activity.

[PROSECUTOR]: Well, the nickname is a gang name. He opened the door. That's his gang name.

[DEFENSE COUNSEL]: He said he doesn't know where it came from.

THE COURT: He's answered that, then.

[PROSECUTOR]: If he knows it's a gang name, can we ask him that?

THE COURT: No. You've asked him if he knew where it came from and he said no.

[PROSECUTOR]: Okay.

THE COURT: So leave it alone.

**(END OF BENCH CONFERENCE.)**

This evidence indicates that defendant opened the door to questions about his nickname. Defendant had been asking what Surles knew of defendant's prior psychiatric hospitalizations, apparently in an attempt to tie the nickname to defendant's purported lack of mental stability. In so doing, he gave the State the opportunity to establish the source of the nickname. "[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself." *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). When the prosecutor asked the names of the friends who imposed the nickname on defendant, Surles responded with the name of the gang itself. At this point, the judge properly sustained defendant's objection and put an end to this line of questioning. As above, we are unable to hold that defendant has shown that the outcome of the trial would have been any different if this evidence had been excluded. N.C.G.S. § 15A-1443(a). In addition, defendant objected to Surles' testimony that he was afraid of defendant's friends. The prosecutor asked Surles about his concerns, and Surles responded that he had not wanted to testify because he knew

the people defendant "hung out with" and did not want to "catch a bullet." The trial court overruled defendant's objection and denied his motion to strike. Although we agree with defendant that this evidence was inadmissible, in light of the evidence of defendant's guilt, we conclude that, as above, the outcome of the trial would have been the same even had this evidence been excluded.

We have also examined the other related testimony to which defendant now objects and find no error. Williams' testimony was to the effect that Fetter was involved with a gang that included defendant, but she did not know if Fetter was a member. Defendant's objection to this testimony was overruled. This evidence was relevant to show Fetter's relationship with defendant, and we fail to perceive that a different result would have been likely if the evidence had not been admitted. EMT Kasulis' testimony that he first saw defendant in a group that may have been up to no good represented no more than the witness' speculation. The trial court sustained defendant's objection to Venth's statement that he did not like being asleep while defendant was in the room, then allowed defendant's motion to strike that testimony. Jurors are presumed to follow the trial court's instructions. *State v. Nicholson*, 355 N.C. 1, 60, 558 S.E.2d 109, 148, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 71 U.S.L.W. 3237 (2002). This assignment of error is overruled.

**[8]** Defendant next argues that the trial court erred when it failed to determine that defendant consented to his attorneys' concession that he was guilty after he abandoned his insanity defense. In *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986), we held that a defendant receives ineffective assistance of counsel *per se* when counsel concedes the defendant's guilt to the offense or a lesser included offense without the defendant's consent. The record in the case at bar shows that prior to trial defendant executed a written waiver on 20 February 2001, which stated:

> I Kyle Berry have been told the risks involved with my defense of insanity to the charge of murder. I know such a defense admits many elements of the offense such as: my identification; my presence at the scene; my connection to co-defendants[;] and my possession of a weapon.
>
> I authorize my attorneys to proceed with this defense and conduct their questioning accordingly.

This waiver was signed by defendant and a witness.

Defendant was questioned by the court at the beginning of trial.

> [THE COURT]: Mr. Berry, I understand from your attorneys that in their openings and closings, you know, there may be statements made by them which could constitute an admission as to your participation in some of the events that are on trial here. I further understand that this [is] a trial strategy.
>
> Now, has this been discussed with you?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. Now, do you understand what they're wanting to do, and do you concur in their assessment of trial strategy and in their actions?
>
> THE DEFENDANT: Yes, sir. They explained that to me.
>
> THE COURT: Okay. I think that takes care of that.

Shortly thereafter, defendant gave his opening statement in which he admitted through counsel that he was present at Fetter's murder and that he may have participated, but that because he was not legally sane, he was innocent. "He is to blame, as are three other people, but he is not guilty."

Two days later, defendant's counsel raised an objection to the court that they had just received from the prosecutor a recording of a police interview with an individual named Michael Walker and that the interview was not consistent with any statement that had been provided during pretrial discovery. In his recorded statement, Walker said that Jon Malonee stabbed Fetter in the head. Defendant represented to the court:

> Michael Walker's interview sounds nothing like any statements that I have seen in the discovery. Among other things, Michael Walker states that Jon Malonee stabbed [the victim] in the head, which is consistent, in part, with a video statement that our client gave to the police in February of '99. Now, had we been in possession of Michael Walker's tape-recorded statement, I am not real sure that we would have entered a notice of our intent to plead not guilty by reason of insanity, and I am not real sure that we would have submitted our client to an interview by a state psychiatrist up at Dorothea Dix and had him give the statement that he gave up there.

The court denied defendant's motions for sanctions and for a mistrial. In his closing argument at the guilt-innocence phase, defendant again argued through counsel that while the State may have proved an attempt to commit first-degree murder, he should be found not guilty or, at most, guilty of second-degree murder.

Although the parties dispute the exact nature of defendant's concessions and whether any discovery violation actually occurred, we believe the resolution of this issue may be found in the trial court's inquiry to defendant at the opening of the trial. This inquiry, quoted in full above, was general, and defendant did not expressly or impliedly condition his consent to acknowledge aspects of guilt upon presentation of an insanity defense. Neither *Harbison* nor any subsequent case specifies a particular procedure that the trial court must invariably follow when confronted with a defendant's concession, *see State v. McDowell*, 329 N.C. 363, 387, 407 S.E.2d 200, 213 (1991), although we have urged "both the bar and the trial bench to be diligent in making a full record of a defendant's consent when a *Harbison* issue arises at trial," *State v. House*, 340 N.C. 187, 197, 456 S.E.2d 292, 297 (1995). While the court's inquiry was brief, it was adequate to establish that defendant consented to the admissions made later by counsel during trial. This Court's opinion in *State v. Morganherring*, 350 N.C. 701, 517 S.E.2d 622 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000), is not to the contrary. In *Morganherring*, the defendant submitted pretrial notice of intent to plead not guilty by reason of insanity, but formally withdrew that notice on the first day of trial and relied instead on a plea of not guilty as to murder but guilty as to the sex offenses. The defendant memorialized this change of strategy in a written *Harbison* statement. Although the written statement referred to an intent to rely on an insanity defense, counsel explained to the court that the statement was prepared before the insanity defense notice was withdrawn but that the defendant nevertheless consented to the admissions of fact to the jury. The trial court questioned the defendant, then allowed the trial to proceed. The defendant was convicted and argued on appeal that he had not understood that abandoning his insanity defense would allow the felony-murder rule to come into play to his detriment. This Court remanded the case for an evidentiary hearing, *State v. Morganherring*, 347 N.C. 393, 494 S.E.2d 399 (1997), then affirmed the trial court's finding that the defendant knowingly consented to the change of strategy and to admission of the facts alleged in the indictments, *State v. Morganherring*, 350 N.C. at 718-19, 517 S.E.2d at 632-33.

In contrast, defendant in the case at bar never formally withdrew his insanity plea and consequently never gave the trial court notice of the change of strategy. Moreover, defense counsel's words to the trial court were, at best, ambiguous in that counsel stated that he was "not real sure" defendant would have proceeded with an insanity defense if Walker's taped statement had been provided to him earlier. In the absence of notice by defendant that his *Harbison* waiver was conditioned upon maintaining his insanity defense, the trial court was justified in assuming that the waiver remained valid throughout trial. This assignment of error is overruled.

[9] Defendant's next assignment of error is related to the preceding one. He contends that the trial court erred in failing to impose meaningful sanctions when the prosecution delayed disclosure of information pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963). Defendant's position is that the prosecutor failed timely to reveal that Michael Walker had told investigators that Malonee had stabbed the victim. Defendant claims that he did not receive this information until after he was committed to a defense strategy based on insanity and that if the disclosure had been timely, he would have pursued a different defense.

The record indicates that Walker made a statement or statements in which he indicated that Malonee told him that he (Malonee) had stabbed a woman. The State invites the attention of this Court to the exhibits pertaining to this dispute, but no exhibits have been submitted to this Court, nor does the record suggest that the exhibits were introduced into evidence. Accordingly, we undertake our review on the basis of representations made by counsel. After the trial was under way, and after defendant had forecast to the jury that he would present an insanity defense, the prosecutor provided to defendant a copy of Walker's statement. Defendant advised the trial court that Walker's statement was new, that it was consistent with a statement defendant had earlier made to police, and that

> had we been in possession of Michael Walker's tape-recorded statement, I am not real sure that we would have entered notice of our intent to plead not guilty by reason of insanity, and I am not real sure that we would have submitted our client to an interview by a state psychiatrist up at Dorothea Dix and had him give the statement that he gave up there.

The prosecutor responded by stating:

STATE v. BERRY

[356 N.C. 490 (2002)]

> I'm not exactly clear whether [defense counsel] is saying Walker
> said Malonee stabbed [the victim] or the Maves woman. This is
> what we gave them, a statement from Jon Malonee, Jon had told
> him this. "Jon said he was stabbing her, and I don't know if that's
> Maves or [the victim], and it was like stabbing a watermelon. Jon
> said he had blood all over him. Jon said [defendant] was rubbing
> her on the chest and in between her legs. Jon said he and [defend-
> ant] took turns having their way with her and put her to sleep."
> The statement from Walker says Jon is not—Jon stabbed the girl
> at the beach. He is not sure if Jon stabbed the girl at the beach or
> [the victim], in reference to the watermelon. Jon told Mr. Walker
> that Bobby had spoke to a girl and so on and so forth, and that's
> what they've got.[2]

Defendant moved for sanctions and for a mistrial; both motions
were denied.

It appears from the comments quoted above and from other
remarks of counsel elsewhere in the record that the prosecutor pro-
vided defendant with the written statements of Malonee from which
Walker's name had been redacted. In his statement, Malonee appar-
ently reported that he had stabbed a woman. During trial, the prose-
cutor additionally provided defendant with Walker's own statement
in the form of a videotape and audiotapes, which corroborated
Malonee. After considering argument of counsel, the trial court
reviewed Walker's material in chambers and reported:

> The first thing I need to address is defendant's motions under
> Brady. Yesterday, I conducted an in camera examination of the
> Walker videotape—well, really three specific audiotapes. With
> respect to the Walker video, it appears that Mr. Walker was talk-
> ing about what a codefendant told him. The defendant was not
> present. However, after looking at all of it, there was nothing
> inconsistent with the evidence that has already been presented
> on the [victim's] case, and it was not, in my opinion, exculpatory,
> as to the [victim's] case; consequently, I find no violation of the
> Brady rules. With respect to the audiotapes, virtually the very
> same thing. The tapes basically were a rehash of what we've
> heard in court. Any new material, or material that was not in
> court or presented in court, does not rise to the level of exculpa-
> tory evidence as to the [victim's] case.

---

2. We have duplicated the punctuation as set out in the trial transcript. We
observe from the context that alternative punctuation might more accurately reflect
those portions of the prosecutor's words where he was quoting Walker's statement.

Accordingly, we conclude that defendant received the substance of Walker's statement when the prosecutor provided through discovery the statement of Malonee in which Malonee said that he had stabbed a female. We now determine whether this sequence of events constitutes a *Brady* violation.

The prosecution is required to turn over to a defendant favorable evidence that is material to the guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215. Evidence is considered "material" if there is a "reasonable probability" of a different result had the evidence been disclosed. *Kyles v. Whitley*, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 506 (1995). Although a *Brady* violation may not constitute error if the favorable evidence is provided in time for the defendant to make effective use of it, *State v. Call*, 349 N.C. 382, 399, 508 S.E.2d 496, 507 (1998), defendant here points out that opening statements had been made and the trial was under way when he was given Walker's statement, far too late to retreat from his original trial strategy.

Our review of the record satisfies us that no *Brady* violation occurred. During the course of pretrial discovery, defendant was provided Malonee's statement to the effect that he had stabbed a woman. Thus, defendant was aware of the substance of this statement in time to develop his trial strategy. *See State v. Strickland*, 346 N.C. 443, 456-57, 488 S.E.2d 194, 202 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). Walker's statement did no more than corroborate that Malonee told Walker the same thing he told police. Moreover, the evidence established that several individuals were involved in the attack on Fetter. Malonee's statement that he stabbed a woman is not inconsistent with defendant's participation in Fetter's murder. We do not perceive any reasonable probability of a different result if defendant had been provided this corroborating evidence earlier in the proceedings. This assignment of error is overruled.

[10] Defendant argues that the trial court erred in failing to sustain his objections to various portions of the prosecutor's closing argument in the guilt-innocence phase. We shall deal with these objections *seriatim*.

First, defendant contends that the prosecutor improperly argued about the impact of the crime on the victim and her family. His position is that this evidence should not have been allowed because the only issue before the jury was the defendant's state of mind at the time of the murder. The prosecutor argued as follows:

I want you to look at that picture because, for all practical pur-
poses, that's all that Margie and Carl Fetter have to remind them
of Theresa, the pictures. Of course, the pictures will remind them
of how it was taken, but the memory fades. The pictures will be
there, the pictures of her smile, like that one there; the pictures of
her frowning; the pictures when she wouldn't frown or smile
because she had glasses—excuse me, braces; the pictures of her
laughing with the family, doing this, doing that; the pictures that
show a little girl that was 16 years old when she was killed; pic-
tures that showed potential and promise and a future. She was 16.
How many more years would she have lived? . . . Eighty some-
thing. Let's say 86, because I can subtract 16 from 80 pretty [well].
It's around 70. Seventy years, that's a lifetime in . . . human history
where 70 years was not just one but two lifetimes. . . . Thirty-five
years to be born and be raised and married and have children and
grandchildren, and that's what Theresa was going to do. She was
going to get—she was going to go out . . . [and] find her a
boyfriend, maybe a boyfriend more like Jason Santana than the
last one she had, and she was going to have children, like—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: —like the ones that—the other grandchildren
these folks have, more grandchildren for Carl and Margie to spoil
and, if lucky, she would have had grandchildren of her own.

Because defendant made a timely objection:

We must determine whether the trial court erred in overruling
[the] objection.

> We have consistently held that counsel must be allowed
> wide latitude in the argument of hotly contested cases. He
> may argue to the jury the facts in evidence and all reasonable
> inferences to be drawn therefrom together with the relevant
> law so as to present his side of the case. Whether counsel
> abuses this privilege is a matter ordinarily left to the sound
> discretion of the trial judge, and we will not review the exer-
> cise of this discretion unless there be such gross impropriety
> in the argument as would be likely to influence the verdict of
> the jury. . . . It is the duty of the trial judge, upon objection, to
> censor remarks not warranted by the evidence or the law and,

in cases of gross impropriety, the court may properly inter-
vene, *ex mero motu.*

*State v. Covington,* 290 N.C. 313, 327-28, 226 S.E.2d 629, 640
(1976) (citations omitted). In making our determination, we
examine the full context in which the statements were made.
*State v. Lloyd,* 354 N.C. 76, 113-14, 552 S.E.2d 596, 622-23 (2001).

*State v. Barden,* 356 N.C. 316, ——, —— S.E.2d ——, ——, 2002
WL 31628181, at *18 (Nov. 22, 2002) (No. 96A01). The comments relat-
ing to the victim's age and expression are well within the scope of
appropriate argument, as is the fact that her parents are left only with
photographs and memories. *See, e.g., State v. Nicholson,* 355 N.C. at
39-40, 558 S.E.2d at 136 (victim-impact testimony may include evi-
dence of effect of victim's death on members of her family). Although
the prosecutor's arguments that the victim might have married and
had children was speculative, it was not excessive. The life the pros-
ecutor posited for the victim if she had lived was a conventional one.
Even assuming *arguendo* that this part of the argument was
improper, we do not believe that the trial court abused its judgment
in overruling defendant's objection.

[11] Next, defendant argues that one of the prosecutors improp-
erly vouched for another prosecutor. This issue arose when the
prosecutor responded to the portion of defendant's closing argu-
ment that challenged witness Venth's motive for testifying. Defense
counsel argued:

Paul Venth is the guy that says that he was testifying out of
the goodness of his heart, yet the state introduced a docu-
ment that shows that he had an assault case dismissed. He got
a plea bargain. . . .

You remember what Mr. Venth said. Oh, I'm doing this out of
the goodness of my heart. But Hovie Pope, who is the arresting
officer in Mr. Venth's case, as well, Hovie talked about possibly
helping [Venth] out on an attempted robbery charge up in Suffolk
County, New York.

The prosecutor responded by discussing Venth's written plea agree-
ment. Phyliss Gorham, the assistant district attorney who negotiated
Venth's plea agreement, was in the courtroom watching but had not
been a participant in defendant's trial. The prosecutor pointed her out
to the jury and said:

[PROSECUTOR]: You can talk about how I didn't do something, you can talk about how Cindy Locklear [co-prosecutor in the instant trial] didn't do something, but Phyllis Gorham is not going to put her name to something—

[DEFENSE COUNSEL]: Objection. Phyllis Gorham is not in evidence in this trial.

THE COURT: Overruled, overruled.

[PROSECUTOR]: And that's what this document says. Not only is Phyllis Gorham's name there, but Geoffrey Hosford, [Venth's] attorney's name, is there, and that man swore to it. There is no other plea bargain.

Although the prosecutor skirted perilously close to vouching for Gorham, defendant's objection, even though overruled, caused him to abandon that argument. Accordingly, we see no prejudicial error in the court's failure to sustain defendant's objection.

**[12]** Defendant next objects to suggestions by the prosecutor that Maves was raped. The record reflects that, during trial, the prosecution called Surles as a witness and asked him what defendant had said to him about Maves. After the court gave a limiting instruction explaining the purposes for which evidence of the Maves killing was being offered, the prosecutor asked Surles what defendant had told him. Surles answered:

[Defendant] told me about the first murder, that he was down at the beach and he was walking with some friends of his and he was—and he had saw a woman, and she was upset, that he had talked to her on the beach, had sex with her, and then she was, as the term goes, freaking out, and he stabbed her in the head with a bottle.

No mention of rape was made until defendant cross-examined Surles:

Q. Now, [defendant] told you that this woman that was killed at Wrightsville Beach, him and Jon raped, is that correct?

A. That's correct.

Q. You've learned a lot about this case since you became involved in it, haven't you?

A. Bits and pieces, yes.

Q. You've learned, haven't you, that there's absolutely no evidence that the girl that was found washed up at Wrightsville Beach had been raped, aren't you?

[PROSECUTOR]: Objection.

THE COURT: Overruled, if he knows. If you know, answer it; if you don't, tell him.

THE WITNESS: No, I do not.

Q. In any event, he said they raped the girl, is that correct?

A. That's correct.

The question whether Maves had been raped arose again during the prosecutor's closing argument when he said:

He said, oh, she wasn't raped. David Surles says she wasn't raped. . . . But look at this. Lisa's panties. Again, information that no one would have had. He wasn't charged with any murder of Lisa Maves. There was no information that Lisa Maves's panties were torn. There also wasn't a rape kit done. We don't know if she was raped or not. The fact of the matter is, those panties were ripped and her short[s were] torn off her.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: Who knew that? Why would he have said rape? Maybe because somebody tried to rape her. Maybe because that's what got her mad—that's what got him mad . . . . Your [sic] heard Paul Venth, he said he killed her because something made him mad. He tried—ripped the shirt off, ripped her panties. She didn't want to be raped, so he killed her.

The prosecutor's argument was apparently triggered by defendant's cross-examination of Surles. The focus of the prosecutor's argument is less that Maves was raped than that Surles had information that was not known to the public and could only have been acquired by someone familiar with the event. In addition, defendant told Surles that he killed Maves because she "freaked out." The prosecutor's argument represents an effort to make sense of this statement by logically inferring a motive for the Maves murder. Such an inference is permissible when not an appeal to passion. *State v. Jones*, 355 N.C. at 135, 558 S.E.2d at 108.

**[13]** Finally, defendant argues that the prosecutor improperly appealed to the prejudices of the jury when he argued:

> Folks, right now you know he had his hand on that knife. Right now you know he put that knife in her skull. Right now you know he stabbed her eight times. And if that ain't an attempt to kill, if that ain't first degree murder, then cut him loose. Let him back out at Wrightsville Beach, let him back out at South College Road. If that's not first degree murder, let him go, but I'll tell you one thing, if you're a woman, if you're alone, if you're defenseless, don't be where he is.

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

> [PROSECUTOR]: If you don't know now he's a murderer, then cut him loose. The law says if you are convinced, beyond a reasonable doubt, you will know. And if you know right now, you don't need to talk about it any more.

The State concedes that it cannot find any authority to suggest that this argument, to the effect that an acquittal would put others at risk, was proper. We agree that the court erred in overruling defendant's objection. However, in light of the evidence of defendant's guilt, the fact that the improper comment consisted of but a single sentence, and the prosecutor's immediate abandonment of that line of argument, we do not hold the error to be prejudicial. This assignment of error is overruled.

## SENTENCING ISSUES

**[14]** Defendant argues that the trial court's instruction as to the (e)(11) aggravating circumstance was clearly erroneous. N.C.G.S. § 15A-2000(e) provides in pertinent part that

> [a]ggravating circumstances which may be considered shall be limited to the following:

> . . . .

> (11) The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

N.C.G.S. § 15A-2000(e)(11). Here, the court instructed the jury as follows:

> The second possible aggravating circumstance which you may consider is number two. Was this murder part of a course of conduct in which the defendant engaged, and did that course of conduct include the commission by the defendant of other crimes of violence against another person or persons? If you find from the evidence, and beyond a reasonable doubt, that the defendant, together with others, murdered Lisa Maves, you would find this aggravating circumstance and would so indicate by having your foreperson write "yes" in the space after this aggravating circumstance on the Issues and Recommendation form. If you do not so find, or have a reasonable doubt as to one or more of these things, you would not find this aggravating circumstance and would so indicate by having your foreperson write "no" in that space.

This instruction is erroneous because it allowed the jury to find the aggravating circumstance without also finding that the murder of Fetter was part of a course of conduct that included the earlier murder of Maves. The mere fact that one murder followed the other does not establish a course of conduct. Consequently, the instruction improperly relieved the burden on the State to prove each and every element of the (e)(11) aggravating circumstance. *See State v. Nobles*, 350 N.C. 483, 516, 515 S.E.2d 885, 905 (1999).

Because defendant did not object to this instruction, we review for plain error. "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998). We have noted that events are more likely to be part of a course of conduct if they are close together in time. *State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692, 705 (1992). Here, the Fetter murder was committed seven weeks after the Maves murder. The two murders were similar in some respects but different in others. The State presented evidence that defendant's motive for killing Fetter was to silence her about the Maves murder. Although we have determined above that the evidence of the Maves murder was properly admitted, we remain advertent to the possibility that knowledge of this earlier murder could have an inflammatory effect on the jury. The trial court's cautionary instruc-

tions when evidence of the Maves murder was admitted during the guilt-innocence phase of the trial prevented that evidence from being unfairly prejudicial. By contrast, the instruction given during the sentencing proceeding allowed the jury to find the course of conduct aggravating circumstance solely on the basis that defendant had committed another murder, effectively negating the cautionary instructions given during the guilt-innocence phase. Because the sentencing instruction allowed the jury to disregard both the potentially attenuating effects of the passage of time on an alleged course of conduct and the differences between the two murders, while relieving the burden on the State of proving the required link between the two murders, we are satisfied that the instruction constituted plain error. Accordingly, we reverse defendant's sentence of death and remand to the trial court for a new sentencing proceeding.

Defendant has raised a number of additional issues related to sentencing. We address the single issue that we believe may recur in the same form at the resentencing hearing.

**[15]** Defendant argues that the trial court erred in instructing the jury as to both aggravating circumstance (e)(4), "[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," N.C.G.S. § 15A-2000(e)(4), and aggravating circumstance (e)(11), "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons," N.C.G.S. § 15A-2000(e)(11). Although we have held that a jury may not find two aggravating circumstances based upon the same evidence, *State v. Goodman*, 298 N.C. 1, 28-29, 257 S.E.2d 569, 587 (1979), we have also held that overlapping evidence may support more than one aggravating circumstance when there is also separate substantial evidence to support each circumstance, *State v. Parker*, 350 N.C. 411, 442, 516 S.E.2d 106, 126-27 (1999), *cert. denied*, 528 U.S. 1084, 145 L. Ed. 2d 681 (2000).

First, we must determine whether sufficient evidence existed to support submission of each aggravating circumstance to the jury. Defendant's own statements provided sufficient evidence to support the (e)(4) circumstance. Although the murders here were several weeks apart, the (e)(11) circumstance was adequately supported by evidence that each victim had been stabbed in the head, that defendant had made efforts to hide each victim's body, and that defendant had participated with others in each murder. *See State v. Cummings*,

346 N.C. 291, 329, 488 S.E.2d 550, 572 (1997) ("In determining whether the evidence tends to show that another crime and the crime for which defendant is being sentenced were part of a course of conduct, the trial court must consider a number of factors, including the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons."), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998).

We must next determine whether this evidence is sufficiently substantial and separate to support submission of each aggravating circumstance. We note that the (e)(4) circumstance focuses on defendant's motive for killing Fetter, while the (e)(11) circumstance required the jury to review the objective facts of the two murders to determine whether the offenses constituted a course of conduct. This Court has held that a defendant's motive appropriately may be considered at sentencing. *State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981). In *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981), we cited *Oliver* when a murder defendant argued that a trial court improperly submitted the two aggravating circumstances that the murder was committed for the purpose of resisting lawful arrest, N.C.G.S. § 15A-2000(e)(4), and that the murder was committed against a law enforcement officer who was engaged in the performance of his lawful duties, N.C.G.S. § 15A-2000(e)(8). *State v. Hutchins*, 303 N.C. at 354-55, 279 S.E.2d at 808-09.

> Of the two aggravating circumstances challenged by defendant here as purportedly being based upon the same evidence, one of the aggravating circumstances looks to the underlying factual basis of defendant's crime, the other to defendant's subjective motivation for his act. The aggravating circumstance that the murder was committed against an officer engaged in the performance of his lawful duties involved the consideration of the factual circumstances of defendant's crime. The aggravating circumstance that the murder was for the purpose of avoiding or preventing a lawful arrest forced the jury to weigh in the balance defendant's motivation in pursuing his course of conduct. There was no error in submitting both of these aggravating circumstances to the jury.

*Id.* at 355, 279 S.E.2d at 809.

We believe that *Hutchins* controls our analysis of this issue. As in *Hutchins*, each circumstance here was offered for a different purpose, and although the evidence supporting the circumstances does

overlap to a degree, nevertheless the State presented separate and substantial evidence to support each circumstance individually. This assignment of error is overruled.

The remaining sentencing issues argued by defendant pertain to the particular instructions provided to the sentencing jury. Because we do not foresee that these particular issues will arise in the same form on resentencing, we do not believe it necessary to address these issues in this opinion.

In conclusion, we find no prejudicial error in the guilt-innocence phase of defendant's capital trial, but we vacate the death sentence and remand for a new capital sentencing proceeding.

NO PREJUDICIAL ERROR IN GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.